UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-81173-Civ-Ryskamp-Hopkins

|  |  |  |
|---|---|---|
| GARY DONALD CARROLL, | : | |
| | : | |
| Plaintiff, | : | **ORAL ARGUMENT REQUESTED** |
| | : | |
| v. | : | |
| | : | |
| THESTREET.COM, INC., a Delaware Corporation; | : | |
| MELISSA ANN DAVIS; THIRD POINT LLC, a | : | |
| Delaware limited liability company; THIRD POINT | : | |
| ADVISORS L.L.C., a Delaware limited liability | : | |
| company, and JAMES L. CARRUTHERS, JR., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**THE THIRD POINT DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT, INCLUDING
CROSS-MOTION FOR SUMMARY JUDGMENT ON THE GROUNDS OF
SUBSTANTIAL TRUTH**

## Table of Contents

Preliminary Statement ................................................................................................ 1

ARGUMENT ............................................................................................................ 2

I.   CARROLL'S DEFAMATION CLAIMS ARE TIME-BARRED. ........................... 2

A.   Equitable Estoppel Requires Misconduct By Defendant And Reliance By
Plaintiff ..................................................................................................... 2

B.   The Third Point Defendants Did *Nothing* To Prevent Carroll From Timely
Filing Suit .................................................................................................. 3

C.   Carroll's "Conspiracy" Theory Does Not Provide A Basis for Equitable
Estoppel ..................................................................................................... 4

1.   Carroll's Theory of Equitable Estoppel is Legally Flawed ..................... 4

a.   The Assertion of the Journalist's Privilege Cannot Give Rise to
Equitable Estoppel ................................................................... 4

b.   Concealment of the Identity of the Tortfeasor Does Not Give Rise to
Equitable Estoppel ................................................................... 6

c.   Filing Pleadings, Motions and an Appeal Cannot Give Rise to
Equitable Estoppel Because Resort to the Courts Is Not
"Misconduct" ........................................................................... 7

2.   Carroll's Theory of Equitable Estoppel is Also Factually Flawed .............. 8

a.   The Third Point Defendants Did Not Encourage TheStreet to Assert
the Journalist's Privilege .......................................................... 8

b.   The Third Point Defendants' Effort to Oppose Carroll's Subpoena
Took Place After The Limitations Period Expired And Cannot Form
the Basis For Equitable Estoppel ............................................. 9

D.   The Civil Conspiracy Claim is Subject to Florida's "Single-Action" Rule ........ 10

II.  THE "SUBSTANTIAL TRUTH" DOCTRINE PRECLUDES DEFENDANTS'
LIABILITY FOR DEFAMATION. .......................................................... 11

A.   Substantially True Statements About Criminal Dispositions Are Not
      Defamatory ................................................................................................. 11

B.   A Statement that a Confessed Felon is a Convicted Felon is Not
      Defamatory ................................................................................................. 13

C.   Carruthers' Statements About Carroll Are Substantially True ......................... 15

      1.   Carruthers' references to Carroll as a "convicted felon" were
            substantially true ...................................................................................... 15

            a.   Carroll confessed to engaging in felony insurance fraud .................... 15

            b.   The entry of a nolle prosequi disposition of the felony charges
                  against Carroll did not constitute exoneration; therefore references
                  to him as a "convicted felon" are substantially true ........................... 18

      2.   Carruthers' statements that Carroll was "indicted" and "sentenced" for
            fraud were substantially true.................................................................... 18

      3.   Carruthers' statements that Carroll worked with other "convicted felons"
            at PBLSC and did business with ArthroCare were substantially true ........ 19

CONCLUSION ........................................................................................................ 20

## Preliminary Statement[1]

Plaintiff Gary Carroll has asserted claims against the Third Point Defendants for defamation and conspiracy to commit defamation.  Carroll alleges that the Third Point Defendants conspired with defendant TheStreet.com, a media company that publishes articles about the financial industry, and its reporter, Melissa Davis (collectively, "TheStreet") to defame him through the publication of a May 21, 2008 article that refers to Carroll as a "convicted felon" (the "Article").  Carroll claims that Davis obtained the information that Carroll was a convicted felon from emails she received from defendant Carruthers.  Summary judgment should be entered dismissing Carroll's claims for two separate and independent reasons.

First, Carroll's defamation claims are barred by the Substantial Truth Doctrine because Carroll is an admitted felon with a documented criminal record in this state.  Carroll was arrested for and charged with felony insurance fraud and felony grand theft.  Carroll admitted to engaging in these crimes in transcribed statements given to the police in connection with his arrest and avoided conviction on both felony charges only by entering into Florida's Pretrial Intervention ("PTI") Program and submitting a sworn affidavit to the prosecutor admitting his guilt.  *See Carpenter v. Drechsler*, No. 89-0066-H, 1991 WL 332766 at *6 (W.D.Va. May 7, 1991) (statement that defendant was a "convicted felon" when he admitted guilt but avoided conviction by entering into a pre-trial intervention program held not defamatory as a matter of law), *aff'd*, 19 F.3d 1428 (TABLE), 1994 WL 85039 (4th Cir. 1994).

Second, Carroll's claims against the Third Point Defendants are barred by the statute of limitations and Florida's single-action rule because they were filed more than two years after publication.  Carroll argues that the Third Point Defendants are equitably estopped from relying on the statute of limitations, but equitable estoppel applies only where "the wrongdoer *prevails upon* the other party to forego enforcing his right until the statutory time has lapsed."  *See* Omnibus Order Granting Motion to Dismiss in Part, *etc*. (DE 86) at 12 (May 25, 2012) ("Omnibus Order") (emphasis added).  Here, the Third Point Defendants took no actions to convince Carroll not to sue within the limitations period—at his recent deposition, Carroll

---

[1]     The Third Point Defendants adopt the arguments set forth in the Motion for Summary Judgment to be filed by Defendants TheStreet.com and Melissa Davis to the extent they apply to the claims asserted against the Third Point Defendants.

admitted that he never communicated with the Third Point Defendants at all.  The Third Point Defendants are therefore entitled to summary judgment on their statute of limitations defense.

## ARGUMENT

## I.    CARROLL'S  DEFAMATION CLAIMS ARE TIME-BARRED

This Court already has held that Carroll's claims against the Third Point Defendants are untimely.  *See* Omnibus Order (DE 86) at 10-11.[2]  Carroll's sole response is that the Third Point Defendants are equitably estopped from asserting the statute of limitations.   But Carroll's equitable estoppel argument fails as a matter of law.

### A. Equitable Estoppel Requires Misconduct By Defendant And Reliance By Plaintiff

"Equitable estoppel presupposes a legal shortcoming in a party's case that is directly attributable to the opposing party's *misconduct*."  *Major League Baseball v. Morsani*, 790 So.2d 1071, 1076-77 (Fla. 2001) (emphasis added) (citations omitted).  *See also* Omnibus Order at 12. The doctrine applies where one "'willfully causes another to believe in the existence of a certain state of things and thereby *induces* him to act on this belief injuriously to himself.'"  *Morsani*, 790 So.2d at 1076 (emphasis added).  In this Court's words, "equitable estoppel arises where the parties recognize the basis for suit, but the wrongdoer *prevails upon* the other party to forego enforcing his right until the statutory time has lapsed."  Omnibus Order (DE 86) at 12 (citing *Hendricks v. Rambosk*, No. 10 Civ. 526, 2011 WL 1429646, at *7 (M.D. Fla. Apr. 14, 2011)) (emphasis added).  *See also Glus v. Brooklyn Eastern Dist. Terminal*, 359 U.S. 231, 232-233, 235 (1959) (denying limitations defense where the defendant had assured the plaintiff that he had seven years in which to bring his claim, when in fact the law permitted only three years); *Alachua County v. Cheshire*, 603 So.2d 1334, 1337 (Fla. 1st DCA 1992) (defendant estopped where its agents repeatedly told plaintiff that he should file his claim with a particular agency, that the agency would pay all valid liens, and that his lien was valid); *Jaszay v. H.B. Corp.*, 598

_____

[2]      The statute of limitations in Florida for defamation claims is two years, Fla. Stat. §95.11(4)(g), and "[a] cause of action for defamation accrues on publication," § 770.07, not on the date that the plaintiff discovers the defamatory statement or its source.  *See* Omnibus Order (DE 86) at 11.  The date of Carruthers' last email to Davis is April 21, 2008.  *See* Plaintiff's Third Amended Complaint ("3AC") (DE-23), Ex. C.  As this Court recognized, that is the date on which Carroll bases his time calculation, *see* 3AC (DE-23) ¶ 97; Omnibus Order (DE 86) at 11 n.5.  Thus, the two year period expired no later than April 21, 2010.  Because "Carroll did not file his claims against Third Point until September 28, 2011—well over two years later," Omnibus Order (DE 86) at 10-11, Carroll's claims are time-barred.

So.2d 112, 113 (Fla. 4th DCA 1992) (defendant estopped because it stipulated to a sixty-day extension of the pre-suit screening period); *Acoustic Innovations v. Schafer*, 976 So.2d 1139, 1144 (Fla. 4th DCA 2008) (defendant denied limitations defense because he "*prevail[ed]* upon the other to forego enforcing his right until the statutory time had lapsed" by repeatedly reassuring the plaintiff that he would honor their agreement to give plaintiff a 50% stake in the business) (emphasis added).

Another way of phrasing the rule is that equitable estoppel "arises when one party *lulls* another into a disadvantageous legal position." *Morsani*, 790 So.2d at 1076 (emphasis added). *See, e.g., City of Brooksville v. Hernando Cnty*, 424 So.2d 846, 848 (Fla. 5th DCA 1982) ("While continuing negotiations regarding settlement do not 'toll' the running of a statute of limitation, such negotiations, if infected with an element of deception, may create an estoppel."); *Rubenstein v. Richard Fidlin Corp*., 346 So.2d 89, 91 (Fla. 3d DCA 1977) (setting aside default judgment obtained without notice because "it was unconscionable for the plaintiff to take advantage of the defendants' failure to file responsive pleadings" after "defendants were misled by the plaintiff into believing that it was unnecessary to file any responsive pleadings because of ongoing settlement negotiations").

### B. Third Point Defendants Did *Nothing* To Prevent Carroll From Timely Filing Suit

Here, Carroll has not even alleged, and certainly cannot prove, that he was lulled into a disadvantageous legal position or induced to forego filing suit or otherwise misled by the Third Point Defendants.  To the contrary, Carroll testified that the Third Point Defendants *never* communicated with him at all.  *See* Transcript of September 25, 2012 Deposition of Gary Carroll ("9/25/12 Carroll Dep. Tr.") at 72-73, 76-78.[3]  Carroll could not say that the Third Point Defendants made settlement offers to "lull" him into a false sense of security, nor that they misled him about the applicable statute of limitations, nor that they reneged on a tolling agreement.  When directly asked, "Can you identify for me, sir, *anything* the Third Point Defendants did to prevent you from suing them in 2009?", Carroll answered "No."  Id. at 80

---

[3]      Copies of the relevant pages of this transcript are attached as Exhibit 1 to the Third Point Defendants' accompanying Statement of Material Facts As To Which It Is Contended That There Does Not Exist A Genuine Issue To Be Tried (the "Statement of Material Facts"). All exhibit references herein correspond to the exhibits to the Statement of Material Facts.

(emphasis added).  *See also* id. at 77 (Carroll stating that he could not identify anything that Third Point did to prevent him from suing them in 2008 when he learned that Carruthers was the source for Davis' article).  *See Pierson v. Orlando Reg'l Healthcare Sys., Inc.,* No. 08 Civ. 466, 2010 WL 1408391, *14 (M.D.Fla. April 6, 2010) (no estoppel where the letter defendants sent to plaintiff "did not inform Plaintiff that the statute of limitation . . . was not running, nor did it otherwise misrepresent anything pertaining to the statute of limitations").

Thus, Carroll's evidence fails to establish any basis for equitable estoppel.  *Cf. Keefe v. Bahama Cruise Line*, 867 F.2d 1318, 1323-24 (11th Cir. 1989) ("To successfully invoke the doctrine, the late arriving plaintiff must show that she 'was misled by defendant or its agents so that [s]he delayed suit because of (a) an affirmative statement that the statutory period to bring the action was longer than it actually was, or (b) promises to make a better settlement of the claim if plaintiff did not bring suit or (c) comparable representations and conduct.'").

### C. Carroll's "Conspiracy" Theory Does Not Provide A Basis for Equitable Estoppel

Carroll has alleged that the Third Point Defendants are equitably estopped from asserting a statute of limitations defense "because his failure to file within the limitations period was the result of a conspiracy between Third Point and TheStreet to conceal the identity of Davis's source."  (Omnibus Order at 11).  This allegation is wrong as a matter of fact and of law.

#### 1. Carroll's Theory of Equitable Estoppel is Legally Flawed

##### a. The Assertion of the Journalist's Privilege Cannot Give Rise to Equitable Estoppel

Carroll contends that the Third Point Defendants are equitably stopped because they conspired with TheStreet to hide Carruthers' identity.  This theory is legally flawed because the Florida appellate court already has held that Carruthers' identity was privileged.  *See TheStreet.Com v. Carroll*, 20 So.3d 947 (4th DCA 2009) (the "Appellate Court Order") (upholding TheStreet.com's assertion of the Florida journalist's privilege over emails identifying Carruthers as the source of the Article and reversing the trial court's decision denying TheStreet.com's motion for a protective order).

As the Florida Supreme Court has held, the doctrine of equitable estoppel "presupposes a legal shortcoming in a party's case that is directly attributable to the opposing party's

*misconduct*." *Morsani*, 790 So.2d at 1077 (emphasis added).  No court has ever held that the assertion of a legally valid privilege can constitute a basis for equitable estoppel.  Nor will Carroll identify any such authority in his opposition.  Thus, even if—contrary to fact—the Third Point Defendants "conspired" with TheStreet to keep Carruthers' identity secret, there would be no basis for equitable estoppel.

"The Florida Supreme Court has held—based on its interpretation of *Branzburg v. Hayes*, 408 U.S. 665 (1972)—that a journalist has a qualified privilege under the First Amendment of the United States Constitution to refuse to reveal … the identity of [her] sources." *Miami Herald Publ. Co. v. Morejon*, 529 So.2d 1204, 1206 (Fla. 3d DCA 1988), *aff'd* 561 So.2d 577 (Fla. 1990).  *See also In re Investigation*, 589 So.2d 978, 979 (Fla. 4th DCA 1991) (affirming "the constitutional right of the public to unencumbered access to information from anonymous sources").

With specific relevance to defamation actions, the Florida Supreme Court has held that the "privilege that a reporter has to protect his sources of information outweigh[s] the public interests in prosecution for a violation of a statute which basically amount[s] to a private interest in reputation." *Miami Herald,* 561 So.2d. at 580 (citing *Tribune Co. v. L.R. Huffstetler*, 489 So.2d 722, 724 (Fla. 1986)).  Thus, the Florida Supreme Court has repeatedly held that the constitutional "interest in assuring the public access to information that comes to the press from confidential informants" *outweighs "a private interest in reputation*."  *Morgan v. State of Florida*, 337 So.2d 951, 955 (Fla. 1976) (emphasis added).  *See also State v. Davis,* 720 So.2d 220, 224-25 (Fla. 1998) ("society's interest in unencumbered access to information from anonymous sources outweigh[s] … a private interest in reputation."); *Morgan*, 337 So.2d at 956 ("If the mere possibility of injury to private reputation justified a court in requiring that a reporter divulge sources, in what circumstances would a reporter not have to give up the names of confidential informants?").

Thus, there is nothing novel, let alone nefarious, in a journalist invoking the state-conferred privilege to keep the identity of her source secret, nor in a source's wish to remain anonymous.  *See Morgan*, 337 So.2d at 953 (important public interests, as well as private interests, may be served by publication of information the press receives from confidential sources"); *id.* at 953 n.5 ("'Even the FEDERALIST PAPERS … were published under fictitious

names.  It is plain that anonymity has sometimes been assumed for the most constructive purposes.'") (citation omitted; ellipsis in original).

Accordingly, even if Carroll could prove that the Third Point Defendants "conspired" with TheStreet to assert the journalist privilege in the state court action (the "State Court Action"), that purported conspiracy could not form the basis for equitable estoppel.

### b. Concealment of the Identity of the Tortfeasor Does Not Give Rise to Equitable Estoppel

Leaving aside the journalist's privilege, even if the Third Point Defendants entered into a "conspiracy" with TheStreet to conceal Carruthers' identity—an allegation for which there is no evidentiary support, as we explain below—that conspiracy would not provide a basis for equitable estoppel.  Carroll confuses equitable estoppel with equitable tolling.  The latter doctrine is the one that is implicated by "[f]raudulent concealment of the identity of the tortfeasor."  *In re Chiquita Brands Int'l*, 690 F.Supp.2d 1296,1315 n.10 (S.D.Fla. 2010) (distinguishing equitable tolling from equitable estoppel).  *See also Cada v. Baxter Healthcare*, 920 F.2d 446, 451 (7th Cir. 1991) (distinguishing the two "frequently confused" doctrines and explaining that equitable tolling applies where the plaintiff knows "that he has been injured" but "he cannot obtain information necessary to decide whether the injury is due to wrongdoing … by the defendant"); *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 192 (1997) (endorsing *Cada*'s distinction between the doctrines).

In some jurisdictions concealment of the tortfeasor's identity might be grounds for equitably tolling the statute of limitations, but not in Florida—as this Court has already held.  *See* Omnibus Order at 11 (citing *Wagner,* 629 So.2d at 114-15).  When the legislature enacted § 95.051, "it enumerated several bases for tolling statutes of limitations, including defendant's use of a false name or concealment in Florida to avoid service of process.  Notably absent from this list was fraudulent concealment of the identity of the actual tortfeasor."  *Putnam Berkley Group v. Dinin*, 734 So.2d 532, 534 (Fla. 4th DCA 1999).  Thus, Florida law "'does not provide for the tolling of the statute of limitations in cases in which the tortfeasor fraudulently conceals his or her identity.'"  *Pac. Harbor Capital Inc. v. Barnett Bank, N.A.,* No. 97 Civ. 416, 2000 WL 33992234, *6 (citation omitted).  *See also Chiquita Brands,* 690 F.Supp.2d at 1315 n.10 (same) (collecting cases); *Lee v. Simon*, 885 So.2d  939,  942-43 (Fla. 4th DCA 2004) (Florida law contains an extension where fraud or intentional concealment prevents the discovery of the

*injury*, but it does not include a similar provision for the failure to discover the negligent actor.") (original emphasis).

Thus, Carroll relies on equitable estoppel while alleging grounds—concealment by the defendant of his identity—that support only the entirely separate doctrine of equitable tolling. Unfortunately for Carroll, equitable tolling on such grounds has been eliminated by the Florida Legislature and rejected by the Florida Supreme Court. "To decide otherwise . . . would require the court to write into the statute a delayed discovery rule even though the Legislature had not done so." *Davis v. Monahan*, 832 So.2d 708, 711 (Fla. 2002).

### c. Filing Pleadings, Motions and an Appeal Cannot Give Rise to Equitable Estoppel Because Resort to the Courts Is Not "Misconduct"

The filing of pleadings, motions and an appeal by TheStreet, even if done as part of a "conspiracy" with the Third Point Defendants, cannot be considered "misconduct" requisite for equitable estoppel. Article I, § 21 of the Florida Constitution guarantees that the "courts shall be open to every person for redress of any injury." *See Univ. of Miami v. Exposito*, 87 So.3d 803, 811-12 (Fla. 3d DCA 2012) (this provision sweeps away any "unreasonable burdens and restrictions" on free access to the courts). In particular, this provision guarantees "the right to appeal." *See Taylor v. Dept. of Children and Families*, 81 So.3d 566, 568 (Fla. 4th DCA 2012). The very creation of a judicial system "necessarily dictates a public policy which encourages the settlement of private disputes through access to the courts." *Fee, Parker & Lloyd v. Sullivan*, 379 So.2d 412, 414 (Fla. 4th DCA 1980).

Carroll's attempt to bootstrap a claim of equitable estoppel on the fact that the Third Point Defendants and TheStreet availed themselves of judicial remedies and due process is misplaced. This conclusion is all the more obvious given that the appeal of the trial court's denial of the journalist's privilege, which Carroll characterizes as part of the "conspiracy" (3AC ¶ 87), was successful—*the trial court was reversed*. 3AC ¶ 88.

The assertion of a party's rights in court filings is nothing remotely akin to the "trickery or foul play," *Todd v. Holder*, No. 11 Civ. 3811, 2012 WL 1642212, at *5 (N.D.Ala. May 7, 2012), or "misconduct," "wrongdoing," "fraud" or "misrepresentation" that is required to estop a defendant from relying on a statute of limitation. *Morsani*, 790 So.2d at 1077, 1078 n.21. *Cf. S&I Invs. v. Payless Flea Market*, 36 So.3d 909, 917 (Fla. 4th DCA 2010) (for the tort of abuse of process, "plaintiff must prove that the process was used for an immediate purpose other than that

for which it was designed.  Where the process was used to accomplish the result for which it was intended, *regardless of an incidental or concurrent motive of spite or ulterior purpose*, there is no abuse of process.") (emphasis in original) (quotation marks and citation omitted); *Suchite v. Kleppin*, No. 11 Civ. 21166, 2011 WL 1814665, at *2-3 (S.D.Fla. April 29, 2011) (same).

## 2. Carroll's Theory of Equitable Estoppel is Also Factually Flawed

### a. Third Point Defendants Did Not Encourage TheStreet to Assert the Journalist's Privilege

As this Court held, "Carroll became aware of the basis for his claims against Third Point when TheStreet produced the unredacted emails from Carruthers on November 17, 2008". (Omnibus Order at 12).  Thus, Carroll was aware that Carruthers was Davis's source long before the limitations period expired on April 21, 2010.  As the following undisputed chronology demonstrates, Carroll's failure to sue the Third Point Defendants within the limitations period was not the result of any "conspiracy" between the Third Point Defendants and the TheStreet, but rather the result of TheStreet's *unilateral*—an undeniably lawful—invocation of the journalist's privilege in Florida state court, which ultimately resulted in the Appellate Court Order barring Carroll from using the unredacted emails "for any purpose":

| | |
|---|---|
| May 21, 2008 | The Article is published by TheStreet.com. |
| July 15, 2008 | Carroll sues TheStreet.com and Melissa Davis. |
| Nov. 17, 2008 | Carruthers is identified as the source through TheStreet's inadvertent production of unredacted emails. |
| Jan. 22, 2009 | TheStreet files a motion for a protective order in the Florida action seeking the return of the unredacted emails on the basis of the journalist's privilege. |
| June 15, 2009 | The Florida trial court rules that the journalist's privilege had been waived. |
| July 6, 2009 | TheStreet files a petition with the Fourth District Court of Appeal in Florida, seeking review of the trial court's denial of the journalist's privilege. |
| Sept. 30, 2009 | Appellate Court Order: The Fourth District reverses the trial judge, upholds the application of the journalist privilege, and remands the case with instructions for the trial court to issue an order barring Carroll "'from any further use of, reference to, or reliance on, the |

8

privileged information.'"  *See* 3AC ¶ 88; *TheStreet.Com v. Carroll*, 20 So.3d 947 (4th DCA 2009).

<span style="color:red">**April 21, 2010          Expiration of two-year statute of limitations period.**</span>

Even if TheStreet's invocation of the journalist's privilege in the state court proceeding could constitute "misconduct" requisite for equitable estoppel—which, as set forth above, it cannot—it could not possibly estop the Third Point Defendants because *they* did not invoke that privilege.  As Plaintiff alleges (3AC ¶ 82) and the court documents confirm, the privilege was invoked by TheStreet.  Nor is there any evidence that the Third Point Defendants "conspired" with TheStreet in connection with TheStreet's filing of its appeal of the trial court's order—an appeal that ultimately proved successful.  To the contrary, the emails exchanged between counsel for the Third Point Defendants and TheStreet merely show that TheStreet kept the Third Point Defendants informed about the status of the appeal.  This is hardly a "conspiracy".

> **b. The Third Point Defendants' Effort to Oppose Carroll's Subpoena Took Place *After* The Limitations Period Expired And Cannot Form the Basis For Equitable Estoppel**

Carroll alleges that, following the "appellate decision in TheStreet.com, Inc., Mr. Carruthers and Third Point colluded and conspired with Davis and TheStreet.com to assert dilatory objections and delay discovery in the State Court Action, and otherwise prevent or delay Carroll from identifying Mr. Carruthers as the source of the defamation".  (3AC ¶ 90).  *See also id.* ¶ 91 ("Third Point even appeared in the State Court Action"), ¶ 92 ("Third Point even objected to the New York subpoena").  The undisputed factual record demonstrates, however, that after the Appellate Court Order, the Third Point Defendants took no actions in the State Court Action or in the New York Supreme Court until December 3, 2010—nearly eight months *after* the statute of limitations period expired:

| | |
|---|---|
| Sept. 30, 2009 | Appellate Court Order |
| <span style="color:red">**April 21, 2010**</span> | <span style="color:red">**Expiration of two-year statute of limitations period**</span> |
| Aug. 13, 2010 | Carroll moves in Florida state court for appointment of commissioner to serve a subpoena on Third Point. |
| Oct. 18, 2010 | Ex Parte Order of New York Supreme Court for the Issuance of a Subpoena to Third Point. |

| Dec. 3, 2010 | Third Point files a motion in New York Supreme Court to quash the Subpoena. |
| Feb. 4, 2011 | Third Point files a motion for protective order in Florida state court. |

Because the motion practice by Third Point to which Carroll objects took place *after* the limitations period expired, that activity (even if it could be considered "misconduct") cannot possibly form a basis for equitable estoppel here.

### D. The Civil Conspiracy Claim is Subject to Florida's "Single-Action" Rule

Carroll's Count VI, "Conspiracy to Commit Defamation," is barred by Florida's "single-action" rule for defamation claims.[4]  As this Court explained with regard to Carroll's claim for intentional infliction of emotional distress ("IIED"):

> Florida's single-action rule … provides that "a single publication gives rise to a single cause of action." *Callaway Land & Cattle Co. v. Banyon Lakes C. Corp*., 831 So.2d 204, 208 (Fla. 4th DCA  2002). "The rule is designed to prevent plaintiffs from circumventing a valid defense to defamation by recasting essentially the same facts into several causes of action all meant to compensate for the same harm." *Id.*   "Thus if the defamation count fails, the other counts based on the same publication must fail as well because the same privileges and defenses apply." *Id.*

Omnibus Order (DE 86) at 13.  As the Court recognized, the IIED claim was a transparent attempt to evade the two-year statute of limitations that bars Plaintiff's defamation claims; IIED, like civil conspiracy, has a four-year limitations period.  *See id.* at 13-14.  But because the IIED claim mimicked the defamation claims by incorporating all of the Complaint's 98 paragraphs of general allegations, it was, this Court concluded, undeniable that the IIED claim and the "defamation claims" were "based on the same set of facts.  This is precisely the type of situation the single-action rule was intended to prevent." *Id.* at 14.[5]

---

[4]     The Conspiracy to Commit Defamation claim also fails because Carroll cannot establish that the Third Point Defendants agreed with TheStreet.com or Davis to defame him.  As this Court explained, a conspiracy claim requires a plaintiff to prove that "'1) two or more parties 2) *agree* 3) to commit an unlawful act.'" Omnibus Order (DE 86) at 15 (emphasis added).  Because there is no evidence of any "agreement", the Conspiracy to Commit Defamation claim must be dismissed.

[5]     The Court dismissed the IIED claim because the alleged defamatory remarks were "not sufficiently outrageous," (DE 86 at 14), rather than because of the single-action rule.  But that

Precisely the same analysis dooms Carroll's conspiracy claim against the Third Point Defendants.  It is undisputed that the conspiracy claim is predicated on the defamation claim: the Complaint explicitly defines the claim as "Conspiracy to Commit Defamation." (3AC p.22, Count VI).   Like Carroll's now-dismissed IIED claim, the conspiracy claim expressly incorporates all 98 paragraphs of the general allegations—the same factual predicate for the defamation claim. (3AC ¶ 140).  Regardless of the four-year limitations period for IIED or civil conspiracy, *any tort claim* that Carroll bases on his defamation claim *is* barred by the two-year limitations period for defamation claims.   As explained in the Court's Omnibus Order, "'[a] *cause of action sounding in tort is limited to the two-year statute of limitations for defamation if it is premised on the defamatory remark*.'" (DE 86 at 13) (quoting *MYD Marine Distrib. v. Donovan Marine, Inc.*, No. 07 Civ. 61624, 2009 WL 701003, at *2 (S.D.Fla. Mar. 16, 2009) (emphasis added).[6]  Thus, Carroll's "conspiracy to commit defamation" claim is time-barred.

## II. THE "SUBSTANTIAL TRUTH" DOCTRINE PRECLUDES DEFENDANTS' LIABILITY FOR DEFAMATION

Carroll is not the first confessed felon to file a defamation lawsuit because he was called a "convicted felon."  Every court to consider the issue has held that referring to confessed felons like Carroll as "convicted felons" does not give rise to a defamation claim.

### A. Substantially True Statements About Criminal Dispositions Are Not Defamatory

Carroll has conceded, as he must, that one of the elements of his defamation claim on which he bears the burden of proof is the "falsity" of the statement.  (DE 155 at 11) (citing *Jews*

---

was only because the IIED claim's identity with the defamation claim—which the Court found would subject the IIED claim to dismissal under the single-action rule—simultaneously brought the IIED claim within the ambit of "Carroll's equitable estoppel argument." *Id.*

[6]      *See also* Omnibus Order (DE 86) at 15 ("A claim for conspiracy to defame cannot stand where the underlying claim for defamation fails.  *Ovadia v. Bloom*, 756 So.2d 137, 140 (Fla. 3d DCA 2000)."); *Thomas v. Patton*, 2005 WL 3048033, at *4 (Fla.Cir.Ct. Oct. 21, 2005) (relying on single-action rule to grant summary judgment to defendants on plaintiff's claims of "conspiracy to defame" and "invasion of privacy" because they were "based upon the same broadcasts as Plaintiff's defamation claim," which had already been dismissed because the supposedly offending publication was found to be substantially true).

*for Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008)).  This is a question of law for the Court and therefore appropriate for resolution by summary judgment.  "It is elementary that the court must, as a threshold consideration, make a determination whether a statement is reasonably subject to a defamatory interpretation." *Nelson v. Assoc. Press*, 667 F.Supp. 1468, 1477 (S.D. Fla. 1987) (citing *Valentine v. CBS, Inc.*, 698 F.2d 430, 432 (11th Cir. 1983)).  *See also Clark v. Clark,* 1993 WL 528464, at *3 (Fla. 4th Cir.Ct. June 22, 1993) ("'Whether particular statements have a defamatory meaning is an issue of law for the court.' Jury submission is only required when the statement is confusing or ambiguous").

      Under both the First Amendment and the common law, the question is whether the statement challenged as defamatory conveys the "substantial truth."  *Masson v. New Yorker Magazine*, 501 U.S. 496, 516 (1991).  Inaccuracies "do not amount to falsity so long as 'the substance, *the gist, the sting of the libelous charge* be justified.'" *Id*. at 517 (emphasis added).  "Put another way, the statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Id*. (quoting R. Sack, LIBEL, SLANDER AND RELATED PROBLEMS 138 (1980)); *see also Nelson*, 667 F.Supp.  at 1477 ("A workable test is whether the libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced.").  "According to the U.S. Supreme Court and Florida case law, falsity exists only if the publication is substantially and materially false, not just if it is technically false."  *Smith v. Cuban American Nat'l Found*., 731 So.2d 702, 707 (Fla. 3d DCA 1999) (quoting *Masson* and the R. Sack book).

      In particular, a speaker "need not describe legal proceedings in technically precise language".  *Rasmussen v. Collier Cnty. Pub. Co*., 946 So.2d 567, 570 (Fla. 2d DCA 2006).  "Newspapers, which are geared for public consumption, may employ the popular gist of a term without engaging in formalistic legal terminology.  Indeed, to require such super-technicality 'would totally eviscerate the 'breathing space' that the Constitution requires in order to protect important First Amendment rights.  When writing about criminal justice or legal matters, newspapers would be forced to recapitulate technical legal terminology employed by courts or law enforcement personnel even where popular words may be clearer for the lay reader.'" *Clark,* 1993 WL 528464, at *3 (Fla. 4th Cir.Ct. June 22, 1993) (quoting *Rouch v. Enquirer & News of Battle Creek Mich.*, 487 N.W.2d 205, 218-19 (Mich. 1992)).  *See also J.D. Hill v. Lakeland Ledger Publishing Corp.*, 231 So.2d 254, 255-56 (Fla. 2d DCA 1970) ("The legal niceties …

cannot render unjustified an otherwise reasonable conclusion with which the true facts are pregnant, *i.e.,* that appellant was in violation of the statute") (affirming summary judgment for the defendant); *Read v. Phoenix Newspapers,* 819 P.2d 939, 942. 943 (Ariz. 1991) ("[a]n incorrect identification of a person's crime in a published report is not, by itself, a triable issue of fact for a jury, particularly when the reported crime, although technically inaccurate, is an accurate reflection of the underlying incident.  Many courts have held that technical errors in legal terminology and reports involving violation of the law are of no legal consequence").

### B. A Statement that a Confessed Felon is a Convicted Felon is Not Defamatory

The opinion in *Carpenter v. Drechsler*, No. 89 Civ. 0066, 1991 WL 332766 (W.D.Va. May 7, 1991), *aff'd,* 19 F.3d 1428 (TABLE), 1994 WL 85039 (4th Cir. 1994), is directly on point and its analysis is compelling.  The plaintiff there, like Carroll here, avoided a felony conviction by agreeing to a pre-trial intervention program.  *Id.* at *2.  As with Florida's PTI Program, the Texas version required an affirmation by the defendant to the court, under oath, acknowledging the evidentiary basis for the charge and his guilt.  *Id.*  Carpenter thereafter moved to Virginia and eventually sued for defamation when his new neighbors and business associates discovered his criminal record and "portrayed him, through constant telephone calls and letters, to other members of the [local] community as a 'convicted felon.'" *Id.* at *3.

Like Carroll here, Carpenter protested that "he [wa]s not a *convicted* felon and that characterizing him as such [was] patently defamatory." *Id.* (emphasis in original).  The district court granted summary judgment for the defendants and held that there was no defamation because, "when the defendants called the plaintiff a 'convicted felon,' they were, at a minimum, saying something that was not substantially inaccurate.  The 'gist' or 'substance' of their statements were true and should not subject them to liability for defamation." *Id.* at *6.   The court's analysis in *Carpenter* is equally applicable to this case:

> in some hyper-technical sense, the statement that the plaintiff is a "convicted felon," when he is only a "confessed felon," may not fully incorporate all of the subtleties of the plea agreement into which he entered with the prosecution, but in any event, there is nothing substantially inaccurate about the statement and, as a matter of law, cannot subject the defendants to any type of liability for defamation.

*Id.* at *6 n.6.

The court in *Hopkins v. Keith*, 348 So.2d 999 (La. Ct. App. 1977) reached a similar conclusion.  In *Hopkins*, a newspaper reported that an individual had been "convicted" of

running an illegal gambling den, when in fact he had merely been arrested for that offense and posted a bond which he thereafter "forfeited." *Id.* at 1001. The court of appeals acknowledged that a bond forfeiture is not the same as a conviction, but it reasoned that there are significant "similarities between the two" dispositions, "particularly in the lay mind," and these cannot be overlooked when assessing the legal question of whether the challenged statements were defamatory. *Id.* at 1002. The court explained that a "conviction is a judicial determination of guilt," whereas the "forfeiture of bond is a decision by the person charged not to appear for trial, thereby avoiding a judicial determination of guilt or innocence." *Id.* at 1002. Therefore, the misrepresentation of a bond forfeiture as a conviction was "relatively insignificant and a relatively minor deviation from the truth." *Id.* This result was guided by First Amendment principles: in reporting "legal and judicial proceedings and records"—which by their nature are "matters of public interest"—"some errors and inaccuracies are bound to occur in the use of technical terms. Not every error or inaccuracy should be actionable." *Id.*.

In fact, liability for defamation has been ruled out on the basis of substantial truth even when the challenged statement confused *criminal char*ges with mere *civil liability*. *See Sivulich v. Howard Publications, Inc.,* 466 N.E.2d 1218, 1219-20 (Ill. App. 1984) (defendant reported that plaintiff had been "charged" with "aggravated battery"; in truth, plaintiff had merely been subject to a civil tort suit). As one Florida court put it, a statement "does not become 'false' simply because an editor or writer has chosen to employ the accepted common term instead of the technical or statutory legalism." *Clark*, 1993 WL 528464 at *2. "Technical inaccuracies in legal terminology employed by nonlawyers" are not actionable. *Rouch*, 487 N.W.2d at 216 (reversing lower court and ruling it was not defamatory to state that individual had been "charged" when in fact there was no "formal arraignment"), *cited in Rasmussen*, 946 So.2d at 570.[7]

---

[7]     *See also Read*, 819 P.2d at 941 (affirming summary judgment for defendant where plaintiff complained he had been defamed by report that he was convicted and jailed for firing a gun in response to another motorist honking her horn, when in fact he had been convicted only of displaying a firearm); *G.D. v. Kenny*, 15 A.3d 300, 304-07 (N.J. 2011) (holding there was no defamation in statement that the plaintiff had been jailed for five years as a drug dealer, when in fact the conviction had been expunged and was only for second degree possession with intent to distribute); *Fendler v. Phoenix Newspapers Inc.,* 636 P.2d 1257, 1262 (Ariz.Ct.App.1981) (defendant reported that plaintiff was "doing four-to-five years in prison" when in fact he was free pending appeal); *Bill Partin Jewelry, Inc. v. Smith,* 467 So.2d 188, 189 (La.Ct.App.1985)

### C. Carruthers' Statements About Carroll Are Substantially True

Carroll's principal complaint is that Carruthers defamed him by referring to him as a "convicted felon". Carroll also challenges Carruthers' statements that Carroll operated a business known as the Palm Beach Lakes Surgery Center ("PBLSC") with other felons that did business with ArthroCare. Because all of these statements are either literally or substantially true, Carroll's defamation claims against the Third Point Defendants fail in their entirety.

#### 1. Carruthers' references to Carroll as a "convicted felon" were substantially true
##### a. Carroll confessed to engaging in felony insurance fraud

Carroll was arrested for, charged with, and prosecuted for felony insurance fraud and grand theft by the State of Florida. Furthermore, Carroll *admitted* to those crimes in sworn statements. Carroll was not convicted for his crimes only because his prosecution was diverted into Florida's felony PTI Program, pursuant to Fla. Stat. § 948.08.[8]  *See* Affidavit of Broward County Assistant State Attorney Jeff Marcus (Feb. 3, 2011) ("Marcus Aff."). (Ex. 16).

---

(defendant reported that plaintiff had participated in burglary; in fact, plaintiff had been accused only of receiving stolen property); *Bosley v. Hebert,* 385 So.2d 430, 431 (La.Ct.App.1980) (defendant reported that plaintiff had been arrested for theft by issuing worthless checks; in fact plaintiff had been arrested for theft of washing machine from his mother-in-law, and all charges were dropped before trial); *Hamilton v. Lake Charles Am. Press, Inc.,* 372 So.2d 239, 240-41 (La.Ct.App.1979) (defendant reported that plaintiff was disbarred and convicted of defrauding insurance companies; in fact his disbarment had been temporarily stayed pending appeal and the conviction was for conspiracy to commit mail fraud); *Simonson v. United Press Int'l. Inc.,* 654 F.2d 478, 482 (7th Cir. 1981) (no defamation in use of technical term "ruled" to describe what were merely judge's remarks from the bench during a sentencing hearing, nor any defamation in using the term "rape" where actual charge to which defendant pleaded no contest was second-degree sexual assault).

[8]     The PTI Program is a criminal-justice program operated by the Florida Department of Corrections, similar to probation. *See* Fla. Stat. § 948.08. A criminal defendant's completion of PTI garners him only the dismissal of the pending felony charges *without prejudice* to the State Attorney's ability to resume prosecution if he sees fit. *See* Fla. Stat. § 948.08(5)(c); *State of Florida v. Board*, 565 So.2d 880, 881 (Fla. 5th DCA 1990) ("the pretrial intervention program places no limits on the state's discretion to reinstate prosecution after pretrial intervention has been approved"). A PTI participant errs if she "assume[s] that the dismissal of the case against her would, in essence, wipe the slate clean." *State of Florida v. Dempsey*, 916 So.2d 856, 859 (Fla. 2d DCA 2005). In *Dempsey*, the Florida Court of Appeal held that it was entirely appropriate for a county school board to "*consider[] [the defendant's] participation in the PTI program an admission of guilt*, thereby making her ineligible for employment" as a teacher. *Id.* at 858 (emphasis added).

The Third Point Defendants have submitted an affidavit of David Benjamin, the Broward County Police detective who arrested Carroll after making several "undercover" calls to him, in which Carroll admitted to attempting to defraud his insurance company and attempted to convince one of Carroll's associates to lie to the police about their scheme.  *See* Affidavit of Broward County Detective David Benjamin (July 24, 2012) ("Benj. Aff.").  (Ex. 9).  Mr. Benjamin's testimony and the documents he authenticates describe the following events:

- On September 11, 1992, Carroll reported to the police that his boat, which he had named "Bad Boy," had been stolen from a marina in Pompano Beach, Florida.  *See* Benj. Aff. at ¶ 4 & Ex. 1 at 2 (Detective Bureau Suppl. Report (Oct. 22, 1992)).  Carroll had just purchased a new boat from the marina's boat broker, Tom King, and had contracted with King to sell the Bad Boy.  *Id.* at 2.

- When Carroll reported the theft to his insurance company he claimed that approximately $12,000 worth of electronic equipment had been on the boat when it was stolen.  Benj. Aff. Ex. 1 at 1. When the Bad Boy was found the next day, floating capsized in the Atlantic Ocean, none of the electronic equipment was aboard.  *Id.* at 1.

- In fact, about a week before the boat's disappearance, a marina handyman named Charlie Brown had, at Carroll's request, removed all of the electronic equipment and delivered it to Carroll's home.  Benj. Aff. Ex. 1 at 1-2.  *See also* October 20, 1992 Sworn Statement of Charlie Brown (Benj. Aff. Ex. 2) at 2-5; October 20, 1992 Sworn Statement of Gary Carroll (Benj. Aff. Ex. 6) at 2-3.

- Carroll then called Tom King at the marina and told him that, if anybody asked, King was to lie and say that all of the equipment had been on the Bad Boy and in good working order when the boat was stolen.   Benj. Aff. Ex. 1 at 2; Sworn Statement of Tom King (Oct. 20, 1992) (Benj. Aff. Ex. 5) at 6-7.

- Through a series of undercover telephone calls to Carroll and King, Detective Benjamin determined that Carroll, with King's assistance, was in the process of defrauding the insurance company.  Benj. Aff. at ¶¶ 6-7; Benj. Aff. Ex. 1 at 2 ("From the undercover calls it was obvious that there was some time [sic] of scam going on and that the two subjects Carroll and King were involved").

- On October 20, 1992, the police asked Carroll to come to the police station, where Carroll gave his own recorded sworn statement to Detective Benjamin. Benj. Aff. ¶9, Ex. 6 (transcript of statement).  In that statement Carroll *admitted* that he deceived the insurance company when he submitted his claim for the boat and all its equipment, *id*. at 4-5.

- On October 20, 1992, Detective Benjamin swore out a probable cause affidavit and Carroll was arrested and charged with insurance fraud.  Benj. Aff. ¶ 10, Ex. 7.

16

On November 2, 1992, Carroll's counsel, Michael Dutko, Esq., wrote to the Assistant State Attorney, explaining that Carroll deliberately lied to his insurance company to secure a better settlement: "Mr. Carroll simply figured that claiming the loss of the additional electronic equipment would facilitate recovery of the fair market value of the boat."   (Letter from Michael Dutko to James Daggett, Nov. 2, 1992) (Ex. 13).

On November 9, 1992, Carroll was charged with felony insurance fraud and felony grand theft in an information filed by the Florida State Attorney for Broward County.  (Ex. 10).  Carroll escaped being formally convicted for his confessed crimes by entering Florida's PTI Program. (Ex. 14, 15).  As a condition of the program, Carroll was required "to submit a signed and sworn typed statement relating the facts and circumstances of the offense for which the Applicant has been arrested/charged."  Marcus Aff. (Feb. 3, 2011) at ¶ 3 (Ex. 16).   "If the factual statement so provided does not contain facts indicative of knowledge or conduct on the part of the Defendant *consistent with guilt*, factually or legally, in the opinion of the Broward SAO, the Broward SAO will not consent to the Defendant's entry into the Program." *Id*. at ¶ 3 (emphasis added).  This requirement of a sworn confession of guilt has been enforced "continuously since at least 1992." *Id*. at ¶ 4.  The official policy of the State Attorney's office repeatedly stresses this mandatory requirement that criminal defendants participating in the program furnish a sworn "admission of guilt statement."[9]

In accordance with this requirement, on May 28, 1993, Carroll submitted a sworn affidavit to the Broward County Circuit Court in which he confessed that he hired Brown to remove the radar and other equipment from his boat and then lied to his insurance company about it having been stolen along with the boat.  *See* May 28, 1993 Affidavit of Gary Carroll (Ex. 11 at ¶ 3) ("the false statement that I made concerning the marine electronic equipment constitutes a factual basis for the criminal charge of Insurance Fraud and Grand Theft.").

---

[9]       *See* Felony Pre-Trial Intervention (PTI), Pretrial Intervention Worksheet at 1, downloaded from http://sao17.state.fl.us/PreTrialInterventionPTI/FELONY_PTI.htm, *last visited* September 14, 2012; *see also id*., Broward County 17th Judicial Circuit Court Pre-Trial Intervention Guidelines at 3 (statement of guilt mandated);  *id.,* Defendant's Sworn Statement Requirement at 1 (same).

**b. The entry of a nolle prosequi disposition of the felony charges against Carroll did not constitute exoneration; therefore references to him as a "convicted felon" are substantially true**

Carroll has argued that "when Mr. Carruthers repeatedly referred to Mr. Carroll as a convicted felon <u>he knew his representations were false</u>," because Carruthers supposedly knew that the charges against Carroll had been nol prossed. (DE 155 at 5 ¶ 18 (emphasis in original).) *See also id.* at 8 ¶ 32 (same); 3AC at ¶¶ 46, 59, 129. But the *nolle prosequi* disposition that Carroll received by participating in the PTI program does not "operate[] as an acquittal." *Bucolo v. Adkins*, 424 U.S. 641, 642 (1976) (*per curiam*) (applying Florida law). *See also Zoll v. Allen*, 93 F.Supp. 95, 97 (S.D.N.Y. 1950) ("A *nolle prosequi*, while entitling the accused to an unconditional release from custody, does not operate as an acquittal") (citing 22 C.J.S. CRIMINAL LAW, § 456). "There is nothing about the pretrial intervention agreement suggesting that the nol pros would indicate innocence. To the contrary, it is equally capable of suggesting [defendant's] guilt…." *Swartsel v. Publix Super Markets*, 882 So.2d 449, 451 (Fla. 4th DCA 2004), *abrogated on other grounds by State Farm Mut. Auto. Ins. Co. v. Nichols*, 932 So. 2d 1067 (Fla. 2006). The "primary purpose" of a nol pros "is to allow *first offenders* who, by definition, are subject to being found guilty of the crime charged, to avoid a conviction on their record by successfully completing the program and having a nol pros entered. As the statute plainly indicates, the resulting dismissal after successful completion of the pretrial intervention program is *without prejudice,* so that if the defendant later commits another offense the prosecutor is authorized to resurrect the charge dismissed. A charge thus hanging in suspense hardly seems to us a bona fide termination indicating innocence." *Id.* at 451-52 (original emphasis). *See also State of Florida v. Jenkins*, 762 So.2d 535, 536 (Fla. 4th DCA 2000) (a *nolle prosequi* can be the basis for revoking the defendant's probation imposed for a prior conviction).

**2. Carruthers' statements that Carroll was "indicted" and "sentenced" for fraud were substantially true**

Carroll also identifies as defamatory Carruthers' statement that Carroll was "indicted" and "sentenced" for insurance fraud. (3AC ¶ 24). The statement that Carroll was "sentenced" for insurance fraud was substantially true for the reasons set forth above. The statement that Carroll was "indicted" was substantially true as well. As explained above, the felony prosecution of Carroll for insurance fraud and grand theft was initiated by an information

submitted to the Broward County court by the State's Attorney on November 9, 1992.  (Ex. 10).
Florida employs both indictments and informations to initiate criminal cases.  Other than capital
crimes, which require indictment by a grand jury, virtually all other crimes may be prosecuted
pursuant to either "indictment or information," Fla.R.Crim.P. 3.140(a)(2), because under the law
they are equivalent "prosecutorial writs."  *See* Fla.R.Crim.P. 3.140(c)(2) & Comm. Notes to
subsection (c).

Therefore, there is nothing defamatory in saying that Carroll was "indicted" when, to be
precise, he was prosecuted pursuant to an "information."  "It is beyond dispute that the average
reader would not know or understand the mechanics by which" criminal prosecutions are set in
motion, "and it strains credulity to suggest that the mere characterization that the plaintiff" had
been indicted rather than prosecuted under an information "would conjure up the impression
which [plaintiff] asserts was made upon the reader." *Windsor v. The Tennessean*, 654 S.W.2d
680, 686 (Tenn. Ct. App. 1983) (no defamation where it was reported that the plaintiff had
"signed" a subpoena, in supposed usurpation of the powers of the court clerk, when in fact he
had "issued" the subpoena as he was entitled to).

### 3. Carruthers' statements that Carroll worked with other "convicted felons" at PBLSC and did business with ArthroCare were substantially true

Carroll claims that he was defamed by emails sent by Carruthers that characterized
Carroll as working with other "convicted felons" in managing the cluster of businesses that
included Carroll's PBLSC, Palm Beach Practice Management ("PBPracM"), and Palm Beach
Pain Management ("PBPM").  3AC ¶¶ 24, 26.  The felon identified by Carruthers was Mark
Izydore.  3AC, Ex. C (DE 23-3).  But this characterization is not merely substantially true—it is
literally true.   Mark Izydore *was* convicted of multiple counts of federal wire fraud and
bankruptcy fraud and was sentenced to five years in federal prison.  *See United States v. Izydore*,
167 F.3d 213, 216-18, 222 (5th Cir. 1999).

Carroll testified that he hired Izydore to work with him at both PBPM and PBPracM, and
that Izydore also managed the administration of PBLSC.  1/20/10 Carroll Dep. (DE 154-1) at 60-
62; 9/25/12 Carroll Dep. (Ex. 1) at 88-89, 97-98, 120-122.[10]  Carroll stated that he hired Izydore

---

[10]     Carroll also testified that Izydore worked as an administrator for both PBPM and
PBPracM.  9/25/2012 Carroll Dep. Tr. (Ex. 1) at 95. Carroll further testified that PBPracM
contracted with another Carroll company, Palm Beach Lakes Partners, LLC, "to manage the

to be the "overall" manager of "the business side" of Carroll's medical practice management business.  1/20/10 Carroll Dep. (DE 154-1) at 61-62.  Thus, Carruthers' statement that Carroll worked with other convicted felons at PBLSC was substantially true.

Carroll has testified that he was the managing member of PBLSC.  1/20/10 Carroll Dep. (DE 154-1) at 46.  He has further admitted that PBLSC was connected to ArthroCare through Jonathan Cutler, a member and manager of PBLSC who created DiscoCare, which had its offices at the very same address as PBLSC, in an adjacent suite.[11]  Cutler and DiscoCare marketed the ArthroCare "Spine Wand" product and DiscoCare's office was at the same address as PBLSC.[12] Cutler sold DiscoCare to ArthroCare on December 31, 2007 for $25 million.[13]  Two ArthroCare executives have recently been federally indicted for crimes involving the purchase of DiscoCare and the sale of spine surgery devices.  (Ex. 21).  Against this background, the innuendo attributed to Carruthers that Carroll was conducting business with ArthroCare through PBLSC (3AC ¶ 24), was, at a minimum, substantially true.

## CONCLUSION

For all the foregoing reasons, the Third Point Defendants' motion for summary judgment should be granted.

---

administrative aspects" of PBLSC.  *Id.* at  121.

[11]    *See* Carroll's Answer to State Farm's Second Amended Complaint (Ex. 20) ¶¶ 17, 107, 110.

[12]    *Id.*

[13]    *Id.* at ¶ 20.

Respectfully submitted,


By: /s/Bruce S. Rogow
BRUCE S. ROGOW
Florida Bar No. 067999
BRUCE S. ROGOW, P.A.
Broward Financial Centre, Suite 1930
500 East Broward Boulevard
Fort Lauderdale, FL  33394
Telephone: (954) 767-8909
Facsimile:   (954) 764-1530
brogow@rogowlaw.com

     and

MATTHEW S. DONTZIN
New York Bar No. 1895200
msdontzin@dontzinfirm.com
DAVID A. FLEISSIG
New York Bar No. 2488260
dafleissig@dontzinfirm.com
THE DONTZIN LAW FIRM LLP
6 East 81st Street
New York, New York 10028
Telephone: (212) 717-2900
Facsimile: (212) 717-8088


*Attorneys for Third Point LLC,*
*Third Point Advisors L.L.C., and*
*James L. Carruthers, Jr.*

21

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on December 20, 2012, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served on this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Filing.

By: */s/ Bruce S. Rogow*
BRUCE S. ROGOW

## SERVICE LIST

Steven J. Rothman, Esquire
Jones, Foster, Johnston & Stubbs, P.A
505 South Flagler Drive, Suite 1100
West Palm Beach, FL 33401
Telephone: (561) 805-5500
Facsimile: (561) 805-5510
srothman@jones-foster.com
*Attorneys for Plaintiff*


Stephen H. Johnson, Esquire
Lydecker Diaz
1221 Brickell Avenue, 19th Floor Miami, Florida 33131
Telephone: (305) 416-3180
Facsimile: (305) 416-3190
shj@lydeckerlaw.com
*Attorneys for Defendants TheStreet.com, Inc. and Melissa Ann Davis*


By: */s/ Bruce S. Rogow*
BRUCE S. ROGOW