**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

Case No.: 11-CV-81173-RYSKAMP/HOPKINS

GARY DONALD CARROLL,

      Plaintiff,

v.

THESTREET.COM, INC, et al.,

      Defendants.

_____/

<u>**OMNIBUS ORDER**</u>

**THIS CAUSE** comes before the Court on Plaintiff Gary Carroll's partial motion for summary judgment **[DE 283]**, Defendants Third Point LLC, Third Point Advisors L.L.C., and James Carruthers's motion for summary judgment **[DE 287]**, and TheStreet.com and Melissa Davis's motion for summary judgment **[DE 291]**.  These motions are fully briefed and ripe for adjudication.

**I.**     **Background**

This is a case for defamation and conspiracy to commit defamation.  Plaintiff Gary Carroll ("Carroll") claims that an article written by journalist Melissa Davis ("Davis") and published by TheStreet.com ("TheStreet") defamed him by labeling him as a "convicted felon" and characterizing him as a "suspected con artist" and a "troubling character."  The article, published on May 21, 2008 and titled "Arthrocare Unit Keeps Troubling Company" (the Article"), discussed Arthrocare Corporation ("Arthrocare"), a medical device company, and its link to other individuals and entities suspected of being involved in an insurance fraud scheme.

1

The other individuals included Carroll, and the other entities included the Palm Beach Lakes Surgery Center ("PBLSC"), where Carroll was formerly a managing partner.

Davis obtained the information regarding Carroll and the suspected insurance fraud from James Carruthers ("Carruthers"), an employee of investment companies Third Point LLC and Third Point Advisors L.L.C. (collectively, "Third Point").  Carruthers contacted Davis and, under a "no attribution" policy in which Davis agreed not to disclose his name or the name of Third Point, he informed her that Carroll was a convicted felon and used PBLSC to commit insurance fraud.  Carruthers also provided Davis with research, background reports, and names of contacts to obtain more information concerning the Arthrocare insurance fraud.

Within ten days of publishing the Article, TheStreet issued a retraction and correction. Davis discovered that Carroll was not a convicted felon.  Apart from Carruthers's assertions, the background report he provided to Davis listed Carroll's past criminal record status as *nolle prosequi*—a legal term of art indicating that Carroll's prosecution was abandoned.  In fact, Carroll was arrested for and charged with felony insurance fraud and felony grand theft.  He avoided conviction by admitting to the basis of those charges and entering into a pre-trial intervention program, or "PTI."  Carroll completed the program successfully and his felony charges were dropped, or "nol prossed."  Thus, Carroll was never convicted and was not a felon.

On July 21, 2008, Arthrocare's stock plummeted.  Third Point had a short position in its stock and made over $95 million on its decline.  Davis was aware of Third Point's financial interest in Arthrocare before the Article was published; however, Carruthers was a trusted and long-standing confidential source.  On this basis, Carroll asserts Third Point conspired with TheStreet to defame him for their financial and editorial benefits—Third Point substantially profiting from the decline in Arthrocare's stock price and TheStreet garnering readership and

investigative prestige.   Carroll seeks actual damages suffered as a result of the Article's publication and punitive damages for Third Point and TheStreet's deliberate falsehoods in naming him a convicted felon and implicating him as such in the context of the Arthrocare insurance fraud scheme.

Carroll moves for partial summary judgment as to his defamation claim on the elements of publication, defamatory, and falsity.   Third Point moves for summary judgment on the grounds that Carroll's claims are time-barred by Florida's two-year statute of limitations and the term "convicted felon," as it applies to Carroll, is substantially true.   TheStreet moves for summary judgment as to Carroll's claims for defamation, conspiracy, and punitive damages. The Court considers all motions together, beginning with the effect of Florida's statute of limitations on Carroll's claim for defamation against Third Point.

## II.      Legal Standard on Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)(1)(A)).  Where the non-moving party bears the burden of proof on an issue at trial, the movant may simply "[point] out to the district court that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.

After the movant has met its burden under Rule 56(c), the burden shifts to the non-moving party to establish that there is a genuine issue of material fact.  *Matsushita Elec. Indus.*

*Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986).  Although all reasonable inferences are to be drawn in favor of the non-moving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), he "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  The non-moving party may not rest upon the mere allegations or denials of the adverse party's pleadings, but instead must come forward with "specific facts showing that there is a *genuine issue for trial*." *Id.* at 587 (citing Fed. R. Civ. P. 56(e)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.*  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).  If the non-moving party fails to make a sufficient showing on an essential element of his case on which he has the burden of proof, the moving party is entitled to a judgment as a matter of law.  *Celotex Corp.*, 477 U.S. at 323.

## III.    Discussion

### A.    Timeliness of Carroll's Claim for Defamation against Third Point

Florida has a two-year statute of limitations for claims of defamation.  Fla. Stat. § 95.11(4)(g).  The last email sent by Carruthers labeling Carroll as a convicted felon was dated April 21, 2008.  Carroll did not file his claims against Third Point until September 28, 2011.  So, unless the effect of the statute of limitations can somehow be avoided, Carroll's claims against Third Point are time-barred.

Before addressing whether Carroll's claim is time-barred, it is necessary to parse the procedural history of this case.  Carroll sued Davis and TheStreet on July 15, 2008 in state court. Carroll did not know the identity of Carruthers (Third Point) or his involvement in the Article.

After TheStreet asserted the defense that it used reasonable care in publishing the Article, Carroll sought discovery on the materials TheStreet used to research the Article. TheStreet invoked Florida's journalist's privilege, Florida Statute § 90.5015.[1]

On November 17, 2008, TheStreet's lawyer inadvertently produced unredacted emails naming Carruthers as Davis's source. TheStreet moved for a protective order, but the trial court ruled the journalist's privilege was waived. TheStreet petitioned for review to the Fourth District Court of Appeal ("4th DCA"), and in an opinion dated September 30, 2009, the 4th DCA reversed the trial court and ruled that TheStreet did not waive the privilege. The court prohibited Carroll from using the privileged information to identify Carruthers and Third Point as the source and remanded the case to the trial court.

On October 15, 2010, Carroll served Third Point with a subpoena requesting documents relevant to the publication of the Article. Third Point moved for a protective order and TheStreet moved for contempt, arguing that Carroll improperly relied on the privileged information to identify Carruthers as the source. The trial court held hearings on the motions and, after extensive motion practice, denied the motions finding that Carroll could have identified Carruthers independently of the unredacted emails. On August 9, 2011, the 4th DCA upheld the trial court's ruling "on the merits." With the trial court's ruling intact, Third Point produced documents revealing Carruthers's involvement in the publication of the Article and was added as a party-defendant on September 28, 2011.

With this history, Carroll argues that Florida's two-year statute of limitations on his claim for defamation should be tolled. Alternatively, Carroll argues that Third Point is equitably estopped from asserting the statute of limitations as a defense. Third Point counters that

---

[1] For a full discussion on the application of Florida's journalist's privilege in this case, see the Court's Order Denying Third Point's Motion for Contempt **[DE 489]** entered on April 10, 2014.

Florida's tolling statute, Florida Statute § 95.051, does not provide a basis for tolling in this instance, and that Florida courts have rejected the doctrine of equitable tolling, as recognized earlier by this Court at the motion to dismiss stage.  Third Point further contends that the doctrine of equitable estoppel is inapplicable because Carroll cannot point to any misconduct, over and above Carroll's alleged claim of conspiracy, which prevented Carroll from timely filing suit. The Court considers these arguments now.

### 1.      Accrual of a Claim for Defamation

The statute of limitations for defamation begins at the time of the first publication.  *See Wagner, Nugent, Johnson, Roth, Romano, Erikson & Kupfer, P.A. v. Flanagan*, 629 So. 2d 113, 114–15 (Fla. 1993) (citing Fla. Stat. § 770.07).  The accrual of the action is not delayed until discovery of the defamatory remark.  *See id.*  This latter concept, known as the "delayed discovery doctrine," delays the start of the statute of limitations period for various torts until the tort is discovered by the plaintiff.  *See, e.g.*, *Hearndon v. Grahem*, 767 So. 2d 1179, 1186 (Fla. 2000) ("We therefore hold that the delayed discovery doctrine applies to the accrual of the instant cause of action based on a claim of childhood sexual abuse accompanied by traumatic amnesia . . . .").  In other words, the time clock which a plaintiff has to bring a claim does not begin to run ("accrue") until discovery.  No conditions are attached; rather, as a matter of equity, courts tend to apply the delayed discovery doctrine unless the clear language of the statute of limitations indicates otherwise.  *See Flanagan*, 629 So. 2d at 114 ("The legislature has established unequivocal guidelines governing the statute of limitations for defamation suits and has decided on a two-year period.").  In this sense, Florida Statute § 95.11(4)(g) functions more as a statute of repose than a statute of limitations.  *See CTS Corp. v. Waldburger*, 2014 WL 2560466, __ S. Ct. __, at *5 (U.S. June 9, 2014) ("Statutes of limitations require plaintiffs to

pursue diligent prosecution of known claims. . . . Statutes of repose reflect legislative decision that as a matter of policy there should be a specific time beyond which a defendant should no longer be subject to protracted liability.") (internal quotations and citations omitted).

It is clear Carroll is afforded no relief under the delayed discovery doctrine. Carruthers's email was published on April 21, 2008 and thus, under section 95.11(4)(g), Carroll had until April 21, 2010 to file suit against Third Point. Carroll filed his claim for defamation against Third Point on September 28, 2011. And, while this concept is straightforward, Florida courts have conflated the delayed discovery doctrine with the "blameless ignorance doctrine," using the terms interchangeably. *See Butler Univ. v. Bahssin*, 892 So. 2d 1087, 1092 (Fla. Dist. Ct. App. 2004). As discussed below, the blameless ignorance doctrine, unlike the delayed discovery doctrine, does not stand on its own, and it does not affect the accrual of a statute of limitations. Rather, it is part of the doctrine of equitable tolling. *See* III. A. 3. This mismatch in terminology has muddled the waters in regards to the application of equitable tolling in civil actions, including defamation suits. The Court clarifies this confusion below, as it analyzes other legal theories for avoiding the statute of limitations.

### 2. Florida's Tolling Statute, Fla. Stat. § 95.051

Section 95.051(1) of the Florida Statutes delineates an exclusive list of conditions that can "toll" the running of the statute of limitations. Unlike "accrual," which affects when the statute of limitations begins, "tolling" suspends the running of the statute of limitations time clock until some condition presented in section 95.051(1) is settled. *See Hankey v. Yarian*, 755 So. 2d 93, 96 (Fla. 2000). In essence, the two are one in the same, simply distinguished by different terminology and applications of law. *See Major League Baseball v. Morsani*, 790 So. 2d 1071, 1078 (Fla. 2001) ("Tolling, strictly speaking, is concerned with the point at which the

limitations period begins to run and with the circumstances in which the running of the limitations period may be suspended."). Florida's tolling statute is strictly construed, as the plain language of the statute limits its reach to conditions that "toll" the statute of limitations: "No disability or other reason shall toll the running of any statute of limitation except those specified in this section . . . ." Fla. Stat. § 95.051(2); *see Morsani*, 790 So. 2d at 1077.

It does not appear that Carroll can avoid the statute of limitations under section 95.051(1). First, he does not invoke the statute as grounds for tolling. Second, as Third Point emphasizes, the only provision in section 95.051(1) which could provide Carroll grounds to toll the statute of limitations is subsection (c), which provides as a basis for tolling "[c]oncealment in the state of the person to be sued so that process cannot be served on him." § 95.051(1)(c). This subsection has been interpreted by Florida courts as to apply only to the fraudulent concealment of the tort itself, and not of the tortfeasor. *See Lee v. Simon*, 885 So. 2d 939, 943 (Fla. Dist. Ct. App. 2004) (citing *Putnam Berkley Grp., Inc. v. Dinin*, 734 So. 2d 532, 534 (Fla. Dist. Ct. App. 1999); *Sullivan v. Fulton Cnty. Adm'r*, 662 So. 2d 706, 707–08 (Fla. Dist. Ct. App. 1995), *rev. in part on other grounds*, 753 So. 2d 549 (Fla. 1999); *Int'l Brotherhood of Carpenters & Joiners of Am., Local 1765 v. United Ass'n of Journeymen Apprentices*, 341 So. 2d 1005, 1006–07 (Fla. Dist. Ct. App. 1976)). Therefore, because Carroll knew of the cause of action of defamation, he does not have grounds to toll the statute of limitations under section 95.051(1)(c).

It is worth mention, however, that this line of reasoning was called into question by the Florida Supreme Court in *Morsani*, when it dismissed a petitioner's argument based on *Sullivan* and *Putnam*. The *Morsani* court noted that *Sullivan*, upon which the decision in *Putnam* was based, was withdrawn. *See* 790 So. 2d at 1080. It further emphasized the fact-specific nature of the case. *See id.* at 1074 n. 2. Given the Court's reading of the plain language of section

8

95.051(1)(c), *Morsani* raises questions about the continuing validity of the current interpretation of subsection (c).  Statutes of limitation are a product of modern legislative processes and are strictly construed as derogations of common law—which had no fixed time limits for filing suit.  *See Morsani*, 790 So. 2d. at 1074–75.  To this Court, a clear construction of section 95.051(1)(c) includes no extra-textual requirement that concealment "of the person to be sued" be fraudulent, and it includes no delineation between the concealment of the tort and the tortfeasor.  In fact, the language of subsection (c) unambiguously supports exclusively the latter: if a tortfeasor ("person to be sued") conceals his identity so that process cannot be served on him, the statute of limitations is tolled.  Nonetheless, Carroll does not rely on section 95.051(1) as a basis to toll the statute of limitations, and the Court declines to find that it tolls the statute of limitations here.[2]

### 3.     Equitable Tolling

The Florida Supreme Court has made it clear that equitable tolling is a legal theory that may operate to deflect the statute of limitations.  *See Morsani*, 790 So. 2d at 1076.  Federal courts ruling otherwise have relied on *HCA Health Servs. Of Fla., Inc. v. Hillman*, 906 So. 2d 1094 (Fla. Dist. Ct. App. 2005) to hold that equitable tolling is not available outside the context of an administrative law proceeding.  *See Socas v. Nw. Mut. Life Ins. Co.*, 829 F. Supp. 2d 1262 (S.D. Fla. 2011); *Watson v. Paul Revere Life Ins. Co.*, No. 11-cv-21492, 2011 WL 5025120 (S.D. Fla. Oct. 21, 2011); *Pierson v. Orl. Regional Healthcare Sys. Inc.*, No. 07-cv-466, 2010 WL 1408391 (M.D. Fla. Apr. 6, 2010).  But, as *Starling v. R.J. Reynolds Tobacco Co.*, 845 F.

---

[2] While the Court believes its interpretation of section 95.051(1)(c) better aligns with the plain language of the statute, it recognizes the tension of that application in defamation actions where a reporter asserts the journalist's privilege to protect the identity of a source.  The journalist's privilege offers a reporter qualified protection from the discovery of her source; as here, a plaintiff may identify the source independently.  *See* Fla. Stat. § 90.5015 (Florida's journalist's privilege).  As a lawful shield to discovery of the source, a court grappling with the interplay of section 95.051(1) and 90.5015, as read here, may hold that the privilege trumps the tolling statute given that the privilege is asserted by, and belongs to, the reporter, and not the source.  This issue, however, is best resolved by the Florida legislature.

Supp. 2d. 1215, 1236–37 (M.D. Fla. 2011) cogently recognizes, *Hillman* was *sui generis*—limited to the facts of that case, and moreover, there is "persuasive evidence . . . that the highest court in Florida would conclude otherwise."   (internal quotation and citation omitted); *see Hillman*, 906 So. 2d at 1099 ("We are not persuaded that our supreme court would allow the [equitable tolling] doctrine to be applied *in a civil action such as Plaintiffs'*.") (emphasis added). As *Starling* points out, *Morsani*, a subsequent Florida Supreme Court case, made no indication that equitable tolling was limited to the administrative law context; rather, it offered the doctrine as one of general availability to delay the running of the limitations period in cases of a "plaintiff's *blameless ignorance* and the lack of prejudice to the defendant." *See Starling*, 845 F. Supp. 2d at 1238; *Morsani*, 790 So. 2d at 1077 n. 11 (emphasis added).   Like other equitable remedies which continue to exist outside the purview of modern statutes (e.g., equitable estoppel, *see Morsani*, 790 So. 2d at 1078), the doctrine of equitable tolling may be used by courts to prevent injustice regardless of the legislative constraints in section 95.051, as demonstrated by the Florida Supreme Court in *Machules v. Dep't of Admin.*, 523 So. 2d 1132, 1134 (Fla. 1988). *See also Aruanno v. Martin Cnty. Sheriff*, 343 F. App'x 535, 537 n.2 (11th Cir. 2009) ("Florida law does allow for tolling in certain instances, Fla. Stat. § 95.051, but that list is exhaustive.  In Florida, equitable tolling may be available when there is no misconduct on behalf of the defendants and may delay the running of the limitations period based on the plaintiff's blameless ignorance and lack of prejudice to the defendant.").[3]

As explained in *Machules*:

---

[3] The Court mistakenly stated that "Florida has rejected the doctrine of equitable tolling" in its Order Granting in Part and Denying in Part Third Point's Motion to Dismiss and TheStreet's Motion to Dismiss **[DE 86]** entered on May 25, 2012.  As explained above, considering courts' fumbling of the doctrines of accrual, statutory tolling, equitable tolling, and equitable estoppel, the Court's misstatement was not without reason.  Because Third Point and Carroll each briefed the issue of equitable tolling, however, the Court finds no party was prejudiced by the Court's earlier declaration.

The doctrine of equitable tolling was developed to permit under certain circumstances the filing of a lawsuit that otherwise would be barred by a limitations period.  The tolling doctrine is used in the *interests of justice* to accommodate both a defendant's right not to be called upon to defend a stale claim and a *plaintiff's right to assert a meritorious claim when equitable circumstances have prevented a timely filing.*  Equitable tolling is a type of "equitable modification," which is generally applied "when the plaintiff has been misled or lulled into inaction, has in *some extraordinary way been prevented from asserting his rights*, or has timely asserted his rights mistakenly in the wrong forum.

523 So. 2d at 1133–34 (emphasis added).   Here, like in *Starling*, the Court finds that extraordinary circumstances prevented Carroll from timely suing Third Point, and therefore, the doctrine of equitable tolling is applicable to toll the statute of limitations.   Indeed, *Starling*'s characterization of the facts of that case as a "procedural perfect storm" to justify the application of equitable tolling fits this case with distinction.   The Court has never seen such an extraordinary progression of rulings, appeals, remands, and further rulings affecting a plaintiff's ability to sue an undisclosed (but inadvertently disclosed) non-party to a case: Third Point's identity was revealed to Carroll on November 17, 2008, 210 days after Carruthers's last email on April 21, 2008, through TheStreet's inadvertent production of unredacted emails.   The trial court ruled that TheStreet's inadvertent disclosure waived the journalist's privilege, but TheStreet appealed.   The 4th DCA stayed this action pending its review, prohibiting any party from using or disseminating information contained in the inadvertently produced emails.   Carroll was left to sit on his hands and wait.   On September 30, 2009, the 4th DCA reversed the trial court and prohibited use of the emails to identify Third Point.   Carroll served Third Point with a subpoena on October 15, 2010, but Third Point moved to quash the subpoena on December 3, 2010.   Third Point later moved for a protective order arguing that Carroll improperly relied on the emails to identify it.   Again, during this period Carroll was precluded from asserting a claim for defamation against Third Point.   On July 8, 2011, the trial court denied Third Point's motion for

protective order ruling that Carroll could have identified Third Point independently of the emails, and it denied Third Point discovery on the motion given that the journalist's privilege belong to Davis and Third Point was not a party to the case.  Third Point appealed, and the 4th DCA again considered the issue.  On August 9, 2011, the 4th DCA denied Third Point's petition and upheld the trial court's ruling "on the merits."   On September 28, 2011 Third Point was added as a defendant to this action.

Given this procedural history, the Court finds the statute of limitations on Carroll's defamation claim against Third Point was tolled from November 17, 2008 (the date Carruthers was identified as the source) through September 30, 2009 (the date of the 4th DCA's decision upholding the journalist's privilege and prohibiting reliance on the unredacted emails), and from December 3, 2010 (the date Third Point moved to quash Carroll's subpoena) through August 9, 2011 (the date the 4th DCA affirmed the trial court's finding that Carroll could have independently identified Third Point).  During these times, Carroll *knew* of the identify of Third Point but was otherwise unable to assert a claim against it given Third Point's use of the judicial process and the state courts' divergent rulings on the issues of the journalist's privilege and Carroll's independent identification of Third Point.[4]  Akin to the court-imposed stay preventing the plaintiff from adding claims within the limitations period in *Starling* (indeed, the 4th DCA did stay this litigation pending its review of the trial court's ruling that the TheStreet waived the journalist's privilege), this amalgamation of events presents the *extraordinary* circumstances necessary for the application of the doctrine of equitable tolling.  *See Starling*, 845 F. Supp. 2d at 1240–41.  Under this tolling structure, the statute of limitations ran from April 21, 2008 to November 17, 2008—210 days, from September 30, 2009 to December 3, 2010—429 days, and

---

[4] The Court notes the inherent unfairness in running the time clock against Carroll while the state courts determined whether he could sue Third Point.

from August 9, 2011 to September 23, 2011—45 days, for a total of 684 days.  This time is within the two-year limitations period provided by section 95.11(4)(g).  Therefore, the Court finds that Carroll's claim for defamation against Carruthers and Third Point is not time-barred.

The Court's determination is supported by policies underlying the doctrine of equitable tolling, the enactment of a statute of limitations, and the creation of the tort of defamation. Equitable remedies, like equitable tolling, are used by courts to prevent injustice.  *See Machules*, 523 So. 2d at 1133–34.  Indeed, equitable tolling requires a plaintiff's blameless ignorance and a lack of prejudice to a defendant.  Here, Carroll's ability (inability) to sue Third Point was not self-determined; rather, judicial processes prevented Carroll from timely filing his claim against it.  Given that Third Point (Carruthers) was the inception of the defamatory statements at issue and it was aware that it could be a party to this case, indeed, actively litigating against that possibility, Third Point is not prejudiced by the Court's application of the equitable tolling doctrine.  In fact, Third Point has fully participated in the merits of this litigation, presenting a complete defense to Carroll's claim for defamation against it—substantial truth.  Moreover, as *Morsani* and *Starling* explain, the use of equitable remedies to toll, or deflect, the statute of limitations is appropriate where a plaintiff "has [not] willfully or carelessly slept on his legal rights" and a defendant is not prejudiced from "unfair surprise" or at "a grave disadvantage" by being forced into defending a stale claim.  *See Starling*, 845 F. Supp. 2d at 1240; *Morsani*, 790 So. 2d at 1074–75, 1078.

Finally, "tort law represents the way in which we draw lines around acceptable and unacceptable non-criminal behavior in our society.  Torts are designed to encourage socially beneficiary conduct and deter wrongful conduct." *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1105 (Fla. 2008).  In particular, the tort of defamation, which developed "as a means for

13

allowing an individual to vindicate his good name . . . [and] for the purpose of obtaining redress for harm," *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 11–13 (1990), recognizes that "a man's reputation [is] possibly his most valuable asset, [and] that vindicating that reputation in the face of one who sought to defame it [is] of paramount importance . . . ." *Krauser v. Evollution IP Holdings, Inc.*, 975 F. Supp. 2d 1247, 1259 (S.D. Fla. 2013).  Where, as here, Third Point is the root of the defamation claim at issue and it is clear that it benefited from its misconduct, the principles of tort law direct providing a means of redress to hold it responsible and to allow Carroll to fully vindicate his reputation.  For these reasons, the Court finds the application of equitable tolling is in the interests of justice, and holds that Carroll's claim against Third Point is not barred by the statute of limitations.[5]  Third Point's motion for summary judgment on this basis is denied.

### 4.      Equitable Estoppel

Considering the Court's ruling above, the Court briefly addresses Carroll's argument for equitable estoppel.  Equitable estoppel, like equitable tolling, is an equitable doctrine based on the principles of fair play and justice.  *Morsani*, 790 So. 2d at 1076.  It arises when "one party lulls another party into a disadvantageous legal position."  *Id.*  In order for the doctrine to be invoked, a party must point to some affirmative misconduct on behalf of the other party.  Moreover, that misconduct must be the cause of the moving party's detriment.  As Florida courts have set out, the elements of equitable estoppel are: "(1) the party against whom estoppel is sought must have made a representation about a material fact that is contrary to a position it later asserts; (2) the party claiming estoppel must have relied on that representation; and (3) the party

---

[5] Given this ruling, the Court declines to address parties' arguments concerning the single-publication rule, and whether it bars a claim for conspiracy to defame where the underlying defamation claim is time-barred against one alleged co-conspirator (Third Point) but not time-barred against another (TheStreet).

seeking estoppel must have changed his position to his detriment based on the representation and his reliance on it." *Watson Clinic, LLP v. Verzosa,* 816 So. 2d 832, 834 (Fla. Dist. Ct. App. 2002) (*citing Lewis v. Dep't of Health & Rehab. Services,* 659 So. 2d 1255, 1256–57 (Fla. Dist. Ct. App. 1995)).

Here, Carroll can point to no *misconduct* on the part of Third Point which induced him to sleep on his claim for defamation. As Carroll concedes, he can point to nothing Third Point did, over and above his claim for conspiracy to defame, to prevent him from filing suit after he learned of Carruthers's identity in 2008. *See Cada v. Baxter Healthcare*, 920 F. 2d 446, 451 (7th Cir. 1991) (equitable estoppel applies only where there are "efforts by a defendant—above and beyond the wrongdoing upon which the plaintiff's claim is founded—to prevent the plaintiff from suing in time"). TheStreet's assertion of the journalist's privilege was its prerogative, and moreover, the privilege belonged to it, and not Third Point. Such a privilege was enacted to promote free discussion of topics of public importance by protecting a source's identity, and TheStreet's use of that privilege by agreement with Carruthers cannot be said to be illicit. Therefore, because Carroll cannot show he relied on affirmative misconduct on the part of Third Point which delayed his suit against it, equitable estoppel does not apply.

### B.    Carroll's Claim for Defamation

The Court now turns towards the merits of Carroll's claim for defamation. Carroll brings this claim against TheStreet and Davis, media defendants, and Carruthers and Third Point, non-media defendants.

Under Florida, defamation has the following five elements: "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual

damages; and (5) statement must be defamatory." *Rapp*, 997 So. 2d at 1106.  The defamatory statement must also be "of and concerning" the plaintiff.  *Thomas v. Jacksonville Television, Inc.*, 699 So. 2d 800, 804 (Fla. Dist. Ct. App. 1997).  As all elements are at issue in parties' motions, the Court proceeds through the elements in order.

### 1.    Publication

Carroll moves for summary judgment on the element of publication.  The publication of a statement in a defamation claim only requires the dissemination of a false statement to a person other than the defamed person.  *See Doe v. Am. Online, Inc.,* 783 So.2d 1010, 1016 (Fla. 2001) (citation omitted).  TheStreet does not contest summary judgment of this element—it published the Article containing the defamatory remarks at issue.  Third Point does not contest publication as applied to Carruthers—he published defamatory remarks by emailing Davis.  Instead, Third Point argues Third Point LLC and Third Point Advisors L.L.C. cannot be held vicariously liable for Carruthers's statements.

An employer can be held liable for the acts of its employees if (1) the acts were committed within the course and scope of employment and (2) the acts were committed, at least in part, to further the interests of the employer.  *See Iglesia Cristiana La Casa Del Senor, Inc.*, 783 So. 2d 353, 356 (Fla. Dist. Ct. App. 2001).  Third Point does not contest that Carruthers was working in the course and scope of his employment for Third Point LLC.  Rather, Third Point argues that Carruthers was not working for Third Point Advisors L.L.C., and that he did not act to benefit the interest of either Third Point entities.  Carroll concedes he is not entitled to summary judgment as to vicarious liability as to Third Point Advisors L.L.C.  Thus, resolution of whether it is vicariously liable for Carruthers's remarks is reserved for the jury.

Regarding Third Point LLC, the Court finds that it is vicariously liable for Carruthers's statements.  Carruthers is a portfolio manager for Third Point LLC and testified he was acting in the scope of his employment.  Moreover, it is clear that he was acting in furtherance of both his and Third Point LLC's interests.  Both benefited by seeing the stock price of Arthrocare decline. Carruthers was paid by commission—the greater gain to Third Point LLC, the more commission he made.  Third Point had a substantial short position in Arthrocare, as evidenced by the $95 million profit made when the stock plummeted on July 21, 2008.  Given these facts, it is clear that Carruthers's defamatory remarks served Third Point LLC's interests.  Therefore, the Court finds Third Point LLC vicariously liable for Carruthers's statements.

### (2)   Falsity ("Substantial Truth")

The crux of this case concerns whether labeling Carroll a "convicted felon" is false, or substantially true.  Inaccuracies "do not amount to falsity so long as the substance, the gist, the sting of libelous charge be justified."  *Masson v. New Yorker Magazine*, 501 U.S. 496, 517 (1991); *see Rapp*, 997 So. 2d at 1107 ("[A] statement is substantially true if its substance or gist conveys essentially the same meaning that the truth would have conveyed.").  "Put another way, the statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced."  *Masson,* 501 U.S. at 517 (internal quotation omitted).  In determining whether a publication is substantially true, a court must look to the context in which the statement is made, as literally true statements may be conveyed in a way that creates a false impression.  *See Rapp*, 998 So. 2d at 1108.

The Court finds that reasonable minds could disagree as to whether the defamatory statements made in the Article are substantially true.  As Third Point and TheStreet would have it, reading the words "convicted felon" in isolation is substantially true.  Carroll was arrested for

and charged with felony insurance fraud and grand theft and submitted a sworn statement under oath admitting to the factual basis for those charges: "[T]he false statement that I made concerning the marine electronic equipment constitutes a factual basis for the criminal charge of Insurance Fraud and Grand Theft."   The only way Carroll escaped prosecution, they argue, is by participating in the PTI program, which eventually led to the *nolle prosequi* of his charges. Successful completion of PTI did not dismiss Carroll's charges *with prejudice*; it garnered him only the dismissal of his charges *without prejudice* to the State's Attorney's ability to resume prosecution if he saw fit.   *See* Fla. Stat. § 948.08(5)(c).   And, his *nolle prosequi* disposition did not operate as an acquittal.   *See Zoll v. Allen*, 93 F. Supp. 95, 97 (S.D.N.Y. 1950) ("A *nolle prosequi*, while entitling the accused to an unconditional release from custody, does not operate as an acquittal.").   Further, minute discrepancies in Carruthers's emails are of no effect: whether Carroll was "indicted" rather than prosecuted under an "information" is a distinction of criminal law which a reasonable person would not understand, or care to know.   Likewise, TheStreet, as a media defendant, cannot be held to a technically precise standard when writing about criminal justice or legal matters.   *See Rasmussen v. Collier Cnty. Pub. Co.*, 946 So. 2d 567, 570 (Fla. Dist. Ct. App. 2006).   As they see it, in the mind of an ordinary reader, if Carroll did it, he did it; it makes no difference whether he was convicted.

Viewing the defamatory statements in isolation, Third Point and TheStreet's arguments are compelling.   However, the Court cannot view the defamatory remarks in a vacuum.   It must view the Article as a whole.   Carroll was arrested for felony charges in 1992; the Article was published in 2008.   Carroll's felony charges related to a false statement he made to his insurance company about electronic equipment he claimed as lost on a personal boat; the Article labels Carroll a convicted felon in the context of an alleged insurance fraud scheme by a publicly-

traded company.  The Article did not clarify these facts; rather, it labeled Carroll a "convicted felon," "con artist," and "troubling character" as it related to then-suspected Arthrocare and PBLSC medical insurance fraud.  The Court finds that a jury could determine that the import of the Article was more pejorative than if TheStreet had accurately reported the 1992 criminal charges in their proper context.  Further, the Court refuses to provide TheStreet with a lower threshold regarding the accuracy of its reporting on Carroll's criminal status.  Cases providing that technical inaccuracies in legal terminology employed by non-lawyers are not actionable deal with real-time reporting of criminal justice matters.  *See, e.g.*, *Rouch v. Enquirer & News of Battle Creek Mich.*, 487 N.W. 2d 205, 218–19 (Mich. 1992); *Read v. Phoenix Newspapers*, 819 P.2d 942, 943 (Ariz. 1991).  Here, by contrast, the Article was published in 2008 and concerned a then-ongoing suspected insurance fraud scheme, not the underlying conduct of Carroll's criminal activity in 1992.  Therefore, TheStreet's argument that it cannot be held to a technically precise standard when labeling Carroll as a "convicted felon" because it is a media defendant is rejected.

While the Court holds that genuine issues of material fact preclude summary judgment as to the element of substantial truth, it clarifies one thing in regards to this defense: its effect is absolute.  That is, should the jury find that the defamatory remarks about Carroll are substantially true, Carroll's claim for defamation fails.  Substantial truth is a complete defense to defamation, regardless of the motives of the defamer.  It is a common tenet of First Amendment law that true statements are inactionable.  Carroll's argument that substantial truth is only a complete defense if coupled with good motives is a relic of the days when libel could be a criminal defense.  *See* Marc Franklin, *The Origins and Constitutionality of Limitations On Truth As A Defense in Tort Law*, 16 Stan. L. Rev. 789, 791 (1964).  It is no surprise that the "good

motive" requirement does not appear in Florida's Standard Jury Instructions and is not recognized by the Federal and Florida Supreme Courts.  *See Rapp*, 997 So. 2d 1107–08.  As stated otherwise: "[T]he Constitution provides a sanctuary for truth . . . ."  *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 596 (D.C. 2000).  To hold otherwise would subject a person to liability for defamation for speaking the gospel truth.[6]

### (3)   Fault

Florida defamation law requires a plaintiff to prove fault.  *See Rapp*, 997 So. 2d at 1106. This is true even when a private plaintiff is suing a non-media defendant and the statement at issue is defamatory "per se."  *See Log Creek, LLC v. Kessler*, 717 F. Supp. 2d 1239, 1247–50 (N.D. Fla. 2010) (discussing *Gertz v. Robert Welch, Inc.*, 418 U.S. 232 (1974), *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985), and *Rapp*, 997 So. 2d at 1106, and concluding that Florida requires a private plaintiff to prove fault against media and non-media defendants); *infra* §III(B)(5) (holding the defamatory statements in the Article are defamatory per se); *see also Obsidian Finance Grp., LLC v. Cox*, 740 F.3d 1284, 1291 (9th Cir. 2014) ("We therefore hold that the *Gertz* negligence requirement for private defamation actions is not limited to cases with [ ] media defendants.") *cert. den.*, No. 13-9731, 2014 WL 1515127, at *1 (U.S. May 27, 2014).  The level of fault a plaintiff must prove depends on her status as a public figure or private individual.  A plaintiff must show that a defendant published the defamatory statement with knowledge or reckless disregard as to its falsity if she is a public figure, or at least negligence if she is a private individual.  *See Rapp*, 997 So. 2d at 1106.

---

[6] The Court notes that a contrary conclusion would be at odds with the Supreme Court's decision in *New York Times v. Sullivan*, 376 U.S. 254, 279 (1964), where the Court held that public officials seeking damages for defamation must show "actual malice."  There, the Supreme Court reasoned that even *false* statements are non-actionable if made without the requisite fault, noting that society must tolerate occasional false statements in order to prevent self-censorship and promote a free exchange of ideas.  *See id.* at 271–72.  For the Court to now hold that true statements, if made in bad faith, are subject to liability would be an extreme departure from the cornerstone principles of defamation and First Amendment law.

Therefore, the Court must decide whether Carroll is a public or private figure, and subsequently, whether the evidence demonstrates a triable issue of fact as to whether TheStreet acted with the requisite level of fault.[7]   Following the Eleventh Circuit's framework in *Silvester v. Am. Broad. Cos.*, 839 F.2d 1491 (11th Cir. 1988), the Court begins by analyzing whether the defamatory speech at issue involves a matter of public concern.

### i.      Matter of Public Concern

First, the Court finds that the speech at issue addressed matters of legitimate public concern.   In this respect, this case is on all fours with *Silvester*.   Like the defamatory speech in that case, the Article addressed suspected corruption in a highly-regulated industry, medical insurance, of which the effects could (and did) cost taxpayers millions of dollars.   *See Silvester*, 839 F.2d at 1493.   As the Court explains below, the impact of such speech reached beyond the parties to this case.   As enunciated in *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980) and adopted by this Circuit, whether Arthrocare and PBLSC were engaged in a massive insurance fraud scheme and whether Carroll, a former managing partner of PBLSC with a troubled criminal history, was involved "had foreseeable and substantial ramifications for nonparticipants."   *Silvester*, 839 F.2d at 1495.   To put simply, corruption in a major industry is a matter of legitimate public concern, not merely public interest.

### ii.      Carroll's Status as a Public or Private Figure

In *Gertz*, the Supreme Court distinguished public figures from private individuals.   First, "public figures usually have greater access to the media which gives them 'a more realistic opportunity to counteract false statements than private individuals normally enjoy.'"   *Silvester.*, 839 F.2d at 1494 (citing *Gertz*, 418 U.S. at 344); *see Hutchinson v. Proxmire*, 443 U.S. 111, 136

---

[7] TheStreet is the only party which moves for summary judgment as to fault.   Therefore, Carroll must only point to a genuine dispute of material fact as to TheStreet's culpability to avoid summary judgment.

(1979) (defining sufficient access to the media for a public figure as "regular and continuing"). Second, public figures "voluntarily expose themselves to increased risk of injury from defamatory falsehoods concerning them." *Id.* (citing *Gertz*, 418 U.S. at 345); *see Waldbaum*, 627 F.2d at 1292 ("[Public figures] thus accept the risk that the press, in fulfilling its role of reporting, analyzing, and commenting on well-known persons and public controversies, will focus on them and, perhaps, cast them in an unfavorable light.").

The Supreme Court also distinguished between "general public figures" and "limited purpose public figures."  General public figures are those individuals who have "assumed roles of especial [*sic*] prominence in the affairs of society," and who have achieved "such fame or notoriety that [they become] public figure[s] for all purposes and in all contexts." *Gertz*, 418 U.S. at 345.  These individuals are rare. *See id.*  More commonly, individuals are limited public purpose figures, those who "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Id.*  Such individuals are public figures only with respect to statements concerning the limited range of issues for which they are prominent. *See id.* at 351.

TheStreet argues Carroll is a limited purpose public figure.  The Eleventh Circuit has adopted the three-part test set forth in *Waldbaum* to make this determination: "(1) isolate the public controversy, (2) examine the plaintiff['s] involvement in the controversy, and (3) determine whether the alleged defamation is germane to the plaintiff['s] participation in the controversy." *Silvester*, 839 F.2d at 1494.  The Circuit also looks to a plaintiff's access to the media, as proscribed in *Gertz*. *See* 839 F.2d at 1496 ("*Gertz* and its progeny clearly state that relative ease of access to the media is one of two factors by which public and private figures can be distinguished from each other.").

Under the first prong of the *Waldbaum* test, courts must determine whether the public controversy affects people who do not directly participate in it.  If so, the "controversy is more than merely newsworthy and is of legitimate public concern."  *Id.* at 1495.  As stated earlier: "If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy."  *Waldbaum*, 627 F.2d at 1297.

First, the Court has already ruled that the defamatory speech at issue affected members of the public other than the litigants in the instant case.  While this Court is concerned about making *ad hoc* determinations about the worth of speech,[8] following the Eleventh Circuit's analysis in *Silvester*, it finds that the Article containing defamatory statements regarding Carroll's criminal connection to a medical insurance fraud scheme—corruption in a highly-regulated industry— was speech about a legitimate public controversy.  In isolating the controversy, the Court finds that the public controversy in the Article is corruption in the medical insurance industry, specifically as it pertains to Arthrocare.  This controversy pre-existed the Article.  Arthrocare and its medical device, the "Spine Wand," were featured in in the local *Palm Beach Post* and the *New York Post* before the Article's publication.  *See Palm Beach Post*, "Investigating Unnecessary Spinal Surgery in Palm Beach County," Feb. 21, 2008; R. Boyd., "Surgical Device Maker's Growth Fueled by Another Company," *New York Post*, Dec. 11, 2007 (reporting the connection between Arthrocare and DiscoCare, a company which the Article insinuated was part of the insurance fraud scheme).  Thus, the publication of the Article did not promote Carroll to the status of a limited public figure.  Moreover, as the Court notes above, the nature of this public controversy underscores its public importance and its effect on outside individuals.  Like

---

[8] *Gertz* seems to suggest that lower courts are not to evaluate whether defamation relates to a matter of public concern, as doing so constitutes censorship.  *See Gertz*, 418 U.S. at 346; Erik Walker, *Defamation Law:Public Figures—Who Are They?*, 45 Baylor. L. Rev. 955, 971 n.84 (1993).

*Silvester*, "the public has a marked interest in a controversy that involves alleged violations of important state regulations." 839 F.2d at 1495. In that case, as here, the potential loss of tax revenue was a marker of legitimate public concern. *See id.* In this case, however, the facts are much more compelling, as the impact of corruption in the medical insurance industry is far more reaching than that of the jai alai industry in *Silvester*. Medical insurance fraud not only leads to an indirect loss of tax revenue to the public, but it also impacts the health and safety of patients and the time and resources of hospitals, doctors, lawyers, and courts.

The second prong of *Waldbaum* addresses the extent of Carroll's involvement in the controversy. To be a limited public figure, Carroll must have voluntarily thrust himself into the controversy in such a way that he (1) tried to influence the outcome of the public controversy or (2) realistically expected to have an impact on its resolution given his position. *See Silvester*, 839 F.2d at 1496. Here, TheStreet's contention that Carroll somehow injected himself into the Arthrocare insurance fraud controversy in a way that invited attention as a limited public figure fails.

TheStreet's sole argument that Carroll is a limited public figure is that he testified in a court case regarding motor vehicle negligence in 2007. This fact alone, however, is not enough to elevate Carroll to the status of a public figure. Unlike the relative plaintiff in *Silvester*, Carroll was not a prominent member of the industry at issue, the medical insurance industry. *See* 839 F.3d at 1497. Nor did Carroll have any direct connection to Arthrocare, the focus of the medical insurance fraud controversy. *Cf. id.* (finding that the "plaintiffs were intimately involved in the public controversy," as one plaintiff was the "principal shareholder" of the jai alai fronton suspected of corruption). Carroll was not even working for PBLSC at the time the Article was published. The Supreme Court has declined to apply the status of a limited public figure in more

compelling circumstances, such as when a plaintiff held a press conference to attempt to influence the public's perception of the defamatory speech at issue.  *See Time, Inc. v. Firestone*, 424 U.S. 448, 454 (1976).

Most importantly, Carroll lacks the hallmark indicia of a public figure as characterized by the Supreme Court and this Circuit: access to media.  *See Gertz*, 418 U.S. at 344; *Silvester*, 839 F.2d at 1495.  While *Silvester* considered as *one factor* in determining that plaintiffs were limited public figures the fact that a relative plaintiff testified concerning the matter of the public controversy, the court noted, in repeated fashion, the plaintiffs' "longstanding access to the media."  839 F.2d at 1495; *see id*. at 1497 (noting that before the publication of the defamatory speech a plaintiff "received much press coverage" and "maintained the spotlight").  In that case, the court relied on the plaintiffs' access to media as a defining factor in holding that they were limited public figures.  *See id.* at 1495–96.  There, the plaintiffs voiced their opinions on matters affecting the corruption in the jai alai industry with local reporters before the defamatory speech was published.  *See id.* at 1495.  Here, no such facts are present.  Carroll did not conduct interviews with reporters or take the same type of steps in an attempt to influence the public perception of the suspected Arthrocare insurance fraud scheme.  He did not have the "regular and continuing" access to the media necessary for the designation of a public figure.  *See Hutchinson*, 443 U.S. at 136.  Therefore, the Court finds that Carroll is a private figure, and he is not held the heightened burden of proving Third Point and TheStreet acted with "actual malice" in publishing the defamatory statements.[9]  He must only prove they were negligent, a burden the Court anticipates he will easily overcome.[10]

---

[9] Given this ruling, it is not necessary to apply the third prong of the *Waldbaum* limited public figure test.

[10] Carroll does not move for summary judgment as to fault.  Therefore, the Court does not make a ruling as to whether Third Point and TheStreet were negligent as a matter of law.

### (4)    Damages

TheStreet moves for summary judgment on the grounds that Carroll cannot prove actual damages.  TheStreet fails to recognize, however, that under Florida law a plaintiff need not prove actual damages to maintain a claim for defamation.   In Florida, defamation damages may be based "on elements other than injury to reputation, such as personal humiliation and mental anguish and suffering."  *Rapp*, 997 So. 2d at 1110 (internal quotations and citations omitted); *see Gertz*, 418 U.S. at 350 ("We need not define 'actual injury,' as trial courts have wide experience in framing appropriate jury instructions in tort actions. Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering."); Florida Standard Jury Instructions in Civil Cases, Substantive Instructions § 405.10 ("Defamation Damages") (listing as elements of damage "[i]njury to reputation or health; shame, humiliation, mental anguish, [and] hurt feelings," and noting that nominal damages may be awarded "to vindicate a right where a wrong is established but no damage is proved").  Therefore, TheStreet's motion for summary judgment as to Carroll's failure to establish actual damages is denied.

Moreover, TheStreet argues that its damages should be limited to Carroll's "actual damages" as a matter of law pursuant to Florida Statue § 770.02.  Section 770.02 limits the amount of damages a plaintiff may recover where: (1) the statements were published in good faith; (2) the statements were false due to an honest mistake of facts; (3) there were reasonable grounds for believing the statements were true; and (4) a full and fair correction, apology, or retraction was published or broadcast within a specific time period.  While TheStreet issued a retraction of the Article, its motion to limit damages is premature.    Specifically, genuine

disputes of material fact exist as to whether TheStreet published the defamatory statements in good faith. Notably, Davis knew Third Point had a financial interest in Arthrocare and TheStreet admits that its editors did not verify Carruthers's information about Carroll prior to the publication of the Article. Therefore, TheStreet's motion is denied in this respect, as well.

Finally, TheStreet contends that this Court should refuse to award Carroll punitive damages because Carroll cannot show that it acted with "actual malice" in publishing the Article. Here, it is important to note that "actual malice," as defined by *Sullivan*, does not equate to ill will. Rather, actual malice may be found where a speaker entertained serious doubts as to the truth of her publication. *See St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Considering the facts above, namely, Davis's knowledge of Third Point's short position in Arthrocare, her failure to adequately verify and investigate Carruthers's background report, and TheStreet's utter lack of editorial oversight, the Court finds reasonable minds could disagree as to whether Davis and TheStreet acted with reckless disregard of the fact that Carroll was not a convicted felon in publishing the Article. Therefore, the Court declines to enter summary judgment as to this issue.[11]

### (5)    Defamatory

In Florida, a defamatory statement is one "that tends to harm the reputation of another by lowering him or her in the estimation of the community or, more broadly stated, one that exposes a plaintiff to hatred, ridicule, or contempt or injures his business or reputation or occupation." *Rapp*, 997 So. 2d at 1109. When a statement facially degrades a plaintiff, brings her into ill repute, or causes similar injury with innuendo, the statement is defamatory per se. *Mid-Florida*

---

[11] The Court clarifies that Carroll will need to prove "actual malice" in order to recover punitive damages from Third Point, as well. A private plaintiff must show actual malice to recover punitive damages when the defamatory statements at issue involve matters of public concern. *See Dun & Bradstreet*, 472 U.S. at 760–61. The Court has determined the defamatory statements published in the Article and made by Carruthers's involve a matter of legitimate public concern. *See supra* § III(B)(3)(i).

*Television Corp. v. Boyles*, 467 So. 2d 282, 283 (Fla. 1985).  A statement that is defamatory per se is injurious on its face and does not require the aid of extrinsic proof.  *See id.*

This Court has already held the statements in this case are defamatory per se.  In its Order Granting in Part and Denying in Part Third Point's Motion to Dismiss and TheStreet's Motion to Dismiss **[DE 86]**, the Court stated:

> While it is true that the Article does not use Carroll's name in the sentence which contain the words "con artists" and "troubling characters," TheStreet completely ignores the fact that the Article expressly refers to Carroll, without use of any "cautionary words," as one of two convicted felons linked to the Arthrocare insurance fraud scheme.  The Article also expressly states that Carroll was previously convicted of insurance fraud.  These statements are defamatory per se.

Nothing has changed since the Court's ruling.  The statements labeling Carroll a "convicted felon," "con artist," and "troubling character," remain the same—they are injurious on their face and require no extrinsic evidence to establish their defamatory meaning.  Therefore, the statements are defamatory per se, and Plaintiff is entitled to partial summary judgment as a matter of law as to this element.[12]

### C.    Carroll's Claim for Conspiracy to Defame

Carroll claims that Third Point and TheStreet conspired together to defame him, each benefiting—financially and editorially—from the publication of the Article.  A claim for civil conspiracy requires a plaintiff to prove that (1) two or more parties (2) agreed (3) to commit and unlawful act.  *Am. United Life. Ins. Co. v. Martinez*, 480 F.3d 1043, 1067 (11th Cir. 2007).

Here, the Court finds triable issues of fact exist as to whether Third Point and TheStreet worked together for their mutual benefit to publish the defamatory statements about Carroll.  While Third and TheStreet argue that Carroll points to no direct evidence that either had the

---

[12]  As stated above, Carroll is still required to prove fault.  Defamation "per se" is simply a "useful shorthand" that the defamatory statements in this case are actionable without resort to innuendo.  *See Edelstein v. WFTV, Inc.*, 798 So. 2d 797, 798 (Fla. Dist. Ct. App. 2001).

illicit purpose to defame him, rather than to publish the Article for their benefit, direct evidence is not required.  "The existence of a conspiracy and an individual's participation in it may be inferred from circumstantial evidence." *Donogrio v. Matassini*, 503 So. 2d 1278, 1281 (Fla. Dist. Ct. App. 1987).  Carroll points to circumstantial evidence supporting his theory of conspiracy.  Specifically, Carruthers and Davis had a long standing, established relationship, whereby Carruthers would serve as a source for insider financial information; Carruthers collaborated closely with Davis on the publication of the Article; Davis knew of Third Point's financial interest in Arthrocare; and, Carruthers and Davis each had much to gain, Third Point shorting Arthrocare for $95 million and TheStreet gaining journalist prestige.  And while TheStreet argues Carroll does not assert that Davis *knew* he was not a convicted felon, as the Court held regarding the issue of punitive damages, genuine disputes of material fact remain as to her level of fault and knowledge in publishing the defamatory statements in the Article.  The facts, viewed in Carroll's favor, support the finding that jury could conclude that Carruthers and Davis conspired to defame Carroll to their mutual benefit.  Therefore, TheStreet's motion to for summary judgment as to this claim is denied.

## IV.    Conclusion

The Court has carefully considered the motions, responses, replies, applicable law, and pertinent portions of the record.  For the foregoing reasons, it is hereby

**ORDERED AND ADJUDGED** as follows:

1.  Carroll's motion for partial summary judgment **[DE 283]** is **GRANTED IN PART AND DENIED IN PART**;

2.  Third Point LLC, Third Point Advisors L.L.C., and James Carruthers's motion for summary judgment **[DE 287]** is **DENIED**; and

3.  TheStreet.com and Melissa Davis's motion for summary judgment **[DE 291]** is

    **DENIED**.

    **DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 7 day of July,

2014.

                            /s/ Kenneth L. Ryskamp
                            KENNETH L. RYSKAMP
                            UNITED STATES DISTRICT JUDGE